INDUSTRIAL CIRCUITS COMPANY v. TERMINAL COMMUNICATIONS, INC.

No. 7510SC290

(Filed 16 July 1975)

1. **Rules of Civil Procedure § 59— disregard of jury instructions — change of verdict by court improper — new trial proper**

     Where the jury manifestly disregarded the trial court's instructions with respect to damages, it was not within the authority of the court to enter an order, "as an alternative to entering a new trial," eliminating an item of damages awarded by the jury and reducing the verdict by that amount; therefore, the action must be remanded for a new trial on the issue of damages. G.S. 1A-1, Rule 59.

2. **Uniform Commercial Code § 20— breach of contract — measure of damages**

     In an action for breach of contract where plaintiff agreed to produce for defendant 6000 printed circuit boards at a stated price per board, six designs were to be used, if defendant requested less than 1000 boards of any design the charge would be more than the amount designated therefor in ascending scales from 200 to 999, this arrangement was referred to as the "bill back" provision, defendant purchased less than 200 boards in each design and then repudiated the contract, and plaintiff computed a "bill back" charge based on its normal sales price for an order of the size filled since the "bill back" provision did not cover quantities of less than 200, the trial court properly instructed the jury to exclude from its consideration of damages the amount charged by plaintiff as the "bill back" item, since the proper measure of damages in the action was the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in G.S. 25-2-710, due allowance for costs reasonably incurred and due credit for payments or proceeds of resale. G.S. 25-2-708(2).

3. **Contracts § 27— breach of contract — motion for directed verdict properly denied**

     The trial court did not err in denying defendant's motion for directed verdict in an action for breach of contract where plaintiff offered evidence of the contract between the parties for the production and sale of printed circuit boards, plaintiff's compliance with the contract and defendant's breach thereof, and plaintiff's items of damage.

BOTH plaintiff and defendant appealed from *McLelland, Judge.* Judgment entered 20 November 1974 in Superior Court, WAKE County. Heard in the Court of Appeals 11 June 1975.

In its complaint filed 8 May 1972, plaintiff alleged that on or about 17 March 1970 the defendant had entered into a

contract to buy printed circuit boards, a type of equipment used in the electronics industry, from the plaintiff, and that the defendant subsequently had breached the contract. In its answer defendant denied it had breached the contract and counter-claimed alleging the plaintiff had breached the contract by failing "to manufacture printed circuit boards of the quality required" and by failing "to comply with agreed delivery schedules."

At the trial plaintiff offered evidence tending to show the following: Printed circuit boards are designed by the buyer and are produced by the manufacturer in strict accordance with the specifications of the buyer. Therefore, a printed circuit board produced for one buyer ordinarily cannot be used by any other buyer and has no market price. On 17 March 1970 plaintiff and the defendant entered into a contract providing that plaintiff would produce "one thousand pieces each of five different printed circuit boards" for a total of 5000 boards and defendant would pay "a price of $21.00 for each with a total dollar value of $105,000." The contract was later modified to provide that a "6th type of circuit board" would be added to the purchase order "[a]gain, for a thousand pieces," but that the dollar value of the order would remain "roughly the same, $105,000" due to an adjustment in the pricing on one of the parts.

The contract did not contemplate that all 6,000 boards would be sent to the defendant in one shipment; instead, the defendant would have the right to request that a specified number of boards be shipped at any time. Defendant then would pay the plaintiff $21.00 for each board shipped. The contract contained a "bill back" clause providing that if the total number of boards requested by the defendant for a particular design did not amount to 1,000, but instead was between 500 and 999, the price per board would be raised to $25.00. Similarly, if the defendant requested only 200 to 499 boards of a particular design, the price per board would be raised to $30.00. This additional charge would be "billed back" to the defendant when the contract was completed. The reason for the "bill back" clause was that through economies of scale, plaintiff was able to produce a larger quantity of printed circuit boards at a lower cost per board than it could a small quantity.

Between 17 March 1970 and 1 December 1970 defendant requested, and plaintiff shipped, a total of 338 printed circuit boards to the plaintiff for all six designs. Defendant requested

less than 200 boards of each design. For these 338 boards defendant paid the plaintiff $6,268.50. On 7 December 1970, plaintiff received a cancellation notice from the defendant, dated 1 December 1970, repudiating the contract "due to poor quality and non-delivery." Since a total purchase of only 338 boards for all six designs was not covered by the "bill back" clause of the contract, the plaintiff computed a "bill back" charge based on its normal sales price for an order of this small size, and this "bill back" amounted to $8,168.51.

Other evidence introduced by the plaintiff tended to show that before repudiating the contract the defendant had repeatedly asked the plaintiff to ship the printed circuit boards more quickly after they were requested and therefore plaintiff had proceeded to build some boards in advance, so that they could be sent to the defendant immediately when a request was received. When the defendant repudiated the contract the plaintiff was "stuck" with boards which had cost it $3,413.15 to produce.

The plaintiff's President and General Manager testified that 10% of the total contract price was the plaintiff's "normal profit on the large quantity type of order like this." On the basis of this testimony the plaintiff maintained it was entitled to lost profits in the amount of $9,853.65 [($105,805—$6,268.50) × 10%] for the unsold boards, not $10,500 ($105,000 × 10%) for the whole contract. As computed by the plaintiff it sustained total damages of $21,630.29 as a result of the defendant's breach of the contract:

"(a) Additional or bill back charges for lesser quantities than included in the original purchase order, as amended.    $8,168.51

(b) Charges for
     (I)  Raw material    $  835.48
     (II) Work in Progress   3,413.15
     Subtotal                                 $4,248.63

(c) Loss of profits on cancellation of balance of entire purchase order computed as follows:
Gross amount of purchase order  $105,805.00
  Less boards shipped        6,268.50
Balance of order at time of    $ 98,536.50
cancellation

Circuits Co. v. Communications, Inc.

| | | |
|---|---|---|
| Margin of profit | 10% | |
| Loss of profits | | $9,853.65 |
| Subtotal | | $22,270.79 |
| Less credit for boards paid for and returned | | 640.50 |
| Plaintiff's asserted cancellation charges | | $21,630.29" |

Defendant's evidence tended to show that the plaintiff breached the contract by failing to manufacture printed circuit boards of the quality required and by failing to comply with agreed delivery schedules; that as a result of the breach defendant incurred extra costs and expenses incident to the use of the plaintiff's boards in its terminal computers; that defendant was finally forced to obtain its printed circuit boards from another supplier at additional expense to itself; and that later defendant purchased equipment and began producing its own boards. As a result of the plaintiff's breach defendant contended it was justified in terminating the contract and that it was entitled to damages of $32,656.00.

The jury found that the defendant had wrongfully breached its contract with the plaintiff. On the issue of damages, the jury found that the plaintiff was entitled to a total recovery of $20,794.81, apparently computed as follows:

| | | |
|---|---|---|
| (1) Bill back charge for reduced quantity releases | | $8,168.51 |
| (2) Charge for work in progress | | 3,413.15 |
| (3) Charge for lost profit on the order | | 9,853.65 |
| Subtotal | | $21,435.31 |
| (4) Less: Credit for boards returned | | — 640.50 |
| | | $20,794.81 |

In its charge the trial court had instructed the jury that the plaintiff was not entitled to recover the "bill back" charge of $8,168.51. Because the jury violated the trial court's instructions the court reduced the plaintiff's damages by $8,168.51 and entered judgment for the plaintiff in the amount of $12,626.30. Both parties appealed.

*Allen, Steed and Pullen, P.A., by Arch T. Allen III, for plaintiff appellant Industrial Circuits Company.*

*Joslin, Culbertson & Sedberry, by William Joslin, for defendant appellant Terminal Communications, Inc.*

MORRIS, Judge.

[1] The court, in its instructions to the jury, specifically directed the jury that they could not consider the "bill back" figures as damages for breach of contract. From the jury verdict, it is apparent that the jury disregarded this instruction and included the bill back charges. From the evidence presented, there is no other way the jury could have arrived at the verdict it did. The court found that the verdict on the third issue (damages) constituted a "manifest disregard by the jury of the instructions of the Court" within the language of G.S. 1A-1, Rule 59 (a) (5), one of the grounds upon which a new trial may be granted upon motion of a party or on the initiative of the court. G.S. 1A-1, Rule 59 (d). We think the court properly found that the jury had disregarded his instructions on this issue. However, we do not agree that the court acted properly or with authority when it entered an order, "[i]n its discretion, as an alternative to ordering a new trial," eliminating the "bill back" item of $8,168.51 and reducing the verdict to $12,626.30, without the consent of the interested party. The rule is stated in *Bethea v. Kenly*, 261 N.C. 730, 732, 136 S.E. 2d 38, 40 (1964):

> " 'It is a cardinal rule that the judgment must follow the verdict, and if the jury have given a specified sum as damages, the court cannot increase or diminish the amount, except to add interest, where it is allowed by law and. has not been included in the findings of the jury.' 2 McIntosh, North Carolina Practice and Procedure. § 1691 (2d ed. 1956); *Durham v. Davis*, 171 N.C. 305, 88 S.E. 433."

We find nothing in the new Rules of Civil Procedure which would grant to the court the authority to modify the verdict by changing the amount of the recovery. See 2 McIntosh, North Carolina Practice and Procedure, §§ 1596, 1691 (2d ed. 1956) and §§ 1596, 1691 (Phillips Supp. 1970).

Each appellant purportedly excepts to the action of the court in reducing the verdict, although no objection or exception thereto appears in the record until after the notice of appeal, appeal entries, and orders extending time for serving case on appeal. However, the appeal itself is considered as an exception to the judgment. 1 Strong, N. C. Index 2d, Appeal and Error, § 24, p. 147. There must be a new trial on the issue of damages.

[2] We are of the opinion that the court was correct in instructing the jury to exclude from its consideration of damages the amount charged by plaintiff as the "bill back" item. The measure of damages is controlled by the applicable portions of the Uniform Commercial Code. In this case G.S. 25-2-708(2) is applicable and provides that the measure of damages "is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this article (§ 25-2-710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale."

G.S. 25-2-710 provides:

"Incidental damages to an aggrieved seller include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach."

As is stated in G.S. 25-1-106, the remedies of the Uniform Commercial Code are to be "liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed but neither consequential or special nor penal damages may be had except as specifically provided in this chapter or by other rule of law."

The Code, however, does not change the measure of damages in North Carolina in cases such as the one before us. The measure of damages suggested by the Code was substantially the measure of damages effective in this State prior to the adoption of the Code. The Supreme Court in *Service Co. v. Sales Co.*, 259 N.C. 400, 415-417, 131 S.E. 2d 9, 21-23 (1963), spoke to the subject in a clear and unambiguous manner. Speaking through Justice Moore, the Court said:

"For a breach of contract the injured party is entitled as compensation therefor to be placed, insofar as this can be done by money, in the same position he would have occupied if the contract had been performed. The amount that would have been received if the contract had been kept and which will completely indemnify the injured party is the true measure of damages for the breach. Where one violates his contract he is liable for such damages, including *gains prevented* as well as *losses sustained,* which may fairly be

supposed to have entered into the contemplation of the parties when they made the contract. *Tillis v. Cotton Mills,* 251 N.C. 359, 111 S.E. 2d 606; *Chesson v. Container Co.,* 215 N.C. 112, 1 S.E. 2d 357.

By 'gains prevented' is meant loss of profits, if any would have been realized from the completed transaction. In determining loss of profit, the following rules are applicable in appropriate circumstances: The measure of damages for the buyer's breach of a contract for the manufacture of goods, where the goods have already been manufactured or produced and where there is an available market therefor, is the difference between the contract price and the market price at the time fixed for delivery. However, if the goods are manufactured for a particular purpose, or for other reasons have no general market value, the rule of damages based on the difference between the contract price and the market price does not apply. In such case, the measure of damages has been generally stated to be the difference between the contract price and the cost of manufacture. If at the time of the breach a part of the goods has been manufactured and delivered, the seller may recover as damages the full contract price (less any credits) for the goods delivered and, as to the portion of the goods not delivered, may recover the difference in the contract price of the undelivered goods and what it would have cost the seller to manufacture and deliver the undelivered portion. *Springs Co. v. Buggy Co.,* 148 N.C. 533, 62 S.E. 637; *Clements v. State,* 77 N.C. 142; 78 C.J.S., Sales, s. 479 (c), pp. 145-6; 44 A.L.R., Anno; Damages—Sales—Buyer's Breach, p. 215, supplemented in 108 A.L.R. 1482; 3 Williston, Sales (Rev. Ed. 1948) s. 583a, p. 246.

'In addition to lost profits, the seller may recover expenditures for labor and materials reasonably made in part performance of the contract, to the extent that they are wasted when performance is abandoned.' 78 C.J.S., Sales, s. 479 (d), p. 147; *Leiberman v. Templar Motor Co.,* 140 N.E. 222, 29 A.L.R. 1089 (N.Y. 1923). In this category of damages 'any expenses which might be reasonably contemplated by the buyer as the probable result of his failure to comply with the contract are properly included' (78 C.J.S., Sales, s. 482, p. 150)—provided, of course, they are wasted expenses, expenses attributable to undelivered goods. But re-

covery of damages and expenses referred to in the two pre-
ceding sentences are limited to such as accrued prior to
notification by the buyer that he would accept no further
deliveries. *Advertising Co. v. Warehouse Co.*, 186 N.C. 197,
119 S.E. 196. In determining damages for wasted materials,
the market or salvage value of unused materials is to be de-
ducted from the cost of the unused materials. The seller must
use reasonable diligence to minimize damages. 78 C.J.S.,
Sales, s. 479 (d), pp. 146-7; *Bennett v. S. Blumenthal & Co.,
Inc.*, 155 A. 68 (Conn. 1931); *Atalah v. Wilson Lewith Ma-
chinery Corp.*, 200 F. 2d 297 (4th Cir. 1952).

There is also the question whether, in determining lost
profits by ascertaining the difference between the contract
price of the undelivered goods and what it would have cost
to manufacture and deliver these goods, the cost should
include overhead expenses and fixed charges reasonably
applicable to the undelivered portion of the contract. In cases,
such as the one at bar, where the seller has an established
and going business and is manufacturing and selling goods
to various buyers, overhead and fixed charges constitute
elements of cost of manufacture and are the subject of
proper inquiry, and they are susceptible of approximate
ascertainment. *Worrell & Williams v. Kinnear Mfg. Co.*,
49 S.E. 988 (Va. 1905). It follows, in such case, that over-
head and fixed charges are elements of damages for wasted
labor and expenses, insofar as they are reasonably applica-
ble thereto. In passing, it should be noted that in cases
where the contract requires the seller to build a factory
or expend large sums in particular preparation to supply
the particular buyer for a long period of time, the cost of
production is computed without including therein any allow-
ance for overhead or fixed charges. *Georgia Power & Light
Co. v. Fruit Growers Express Co.*, 190 S.E. 669 (Ga. 1937)."

Applying those rules the Court said that if defendant had
breached the contract, plaintiff could recover as damages:

"(a) The unpaid balance of the contract price for the units
manufactured and delivered; (b) lost profits with respect
to the undelivered portion of the purchase order, that is,
the difference between the contract price of the undelivered
units and what it would have cost to manufacture and deliver
them. The cost of manufacture is to include the cost of
materials necessary to manufacture the undelivered units,
the cost of direct labor thereon, and overhead and fixed

charges. Overhead, of course, includes such items as factory overhead, administrative costs and selling costs. (c) Cost of materials, labor, overhead and fixed charges wasted by reason of the breach, but only such as accrued prior to the notification to cease deliveries. The amount of damages for materials wasted is to be determined by the difference between the cost of the materials on hand at the time of notification and the market or salvage value of such materials."

We think the measure of damages set out by the court is the same as that prescribed by the Code. Of course, in the case before us, defendant would be entitled to credit for goods returned.

In addition to the question of reducing the verdict of the jury raised by both plaintiff and defendant on appeal and questions with respect to the measure of damages presented by both parties on appeal, defendant appellant contends that the trial court erred in refusing to grant its motion for a directed verdict, in its phrasing of the first issue submitted to the jury, and in its charge to the jury on the first issue.

According to the record before us, the defendant made no objection at the time of trial to the court's denial of its motions for directed verdict made at the close of plaintiff's evidence and renewed at the end of all the evidence. Exception to the ruling of the court appears for the first time at the end of plaintiff appellant's grouping of exceptions and assignments of error and just before defendant appellant's grouping of exceptions and assignments of error. Nor does the record reveal defendant's objection to the issues submitted by the court. The order on final pre-trial conference does indicate that each party had its own idea of the issues to be submitted and were not, at that time, in agreement on the issues. However, the record does not reveal that either party ever tendered issues to the court and excepted to the court's refusal to submit the tendered issues. Nor does the charge of the court contain exceptions thereto raised by either party. Defendant's exceptions to the charge appear for the first time in the record in the same manner as its exceptions to the court's failure to grant its motion for directed verdict. Even there, the Court is not referred to the page of the record where the alleged error in the instructions appear, nor does the assignment of error indicate what appellant contends the court should have charged. Nevertheless, in spite of the failure properly to bring exceptions to the attention of the

Court, we have chosen to discuss defendant's purported excep-
tions, as we did plaintiff's purported exceptions which are sub-
ject to the same criticism.

[3]   The parties stipulated as follows: "Plaintiff and Defendant
entered into a contract on or about March 17, 1970, for Plaintiff
to manufacture and sell to Defendant certain 'PC Boards.' These
goods are printed circuit boards containing series of interrelated
and connecting circuits. These boards were components of com-
puter terminals manufactured by Defendant." Plaintiff intro-
duced evidence tending to show that the contract between the
parties provided that plaintiff would produce 1000 "PC Boards"
in accordance with each of five designs submitted by defendant
for a total of 5000 boards. Defendant would pay plaintiff $21
per board for a total price of $105,000. The contract was later
changed by purchase order dated 13 May 1970 to add a sixth
design, denominated as #0231 PC Board, from which 1000
boards would be manufactured. The price for this design would
be $10.50 per board and the price for #0230 PC Board was
changed to $10.50, leaving the total price at $105,000. It was not
contemplated that all 6000 boards would be delivered in one
shipment. Rather, defendant had the right to request a specified
number which would be manufactured, shipped, and payment
made upon delivery. The contract provided that if defendant
should request less than 1000 boards of any design the charge
would be more than the amount designated therefor in ascend-
ing scales from 200 to 999. This is referred to as the "bill back"
provision, the additional charge to be billed back to defendant
when performance of the contract was completed. Plaintiff testi-
fied that the reason for this provision was that it could produce
larger quantities at a lower cost per board than it could a small
quantity. Defendant requested and plaintiff shipped a total of
338 boards for all six designs, less than 200 of any one design.
Defendant paid for these boards $6,268.50. Defendant then re-
pudiated the contract. Since the bill back clause did not cover
quantities less than 200, plaintiff computed a bill back charge
based on its normal sales price for an order of the size filled
and billed defendant for $8,168.50. Plaintiff further testified
that defendant, prior to repudiating the contract, repeatedly
requested more prompt delivery after request. Accordingly,
plaintiff began to manufacture boards ahead of request so that
requests could be filled more quickly. When defendant repudi-
ated, plaintiff had a supply of boards on hand and its expense
in producing them was $3,413.15. Plaintiff further testified,

without objection, that its normal profit on an order the size of this one was 10%. We think the evidence is sufficient to withstand a motion for directed verdict.

Defendant's evidence tended to show that the boards manufactured by plaintiff were defective in many ways, that delivery was not as promised and that defendant was justified in repudiating the contract. Defendant further testified that it was common practice in the industry "to have a bill back clause with a purchase agreement"; that it did not assume that defendant was obligated to purchase 1000 of each of the six type boards; and that although the contract might say 1000 it really meant something less than that.

The contract itself provides in paragraph 9:

"Minimum Order Quantities:

To qualify for pricing under this purchase order, the following minimums shall be observed:

*Per Order*

Each release issued must have a dollar value of not less than *NA*.

*Per Item*

Each item ordered must be ordered in a dollar value of not less than *NA*."

Paragraph 10 provides:

"In the event that the reject rate for any item is in excess of one percent at Terminal Communications, Inc. receiving inspection, the price adjustment schedule in paragraph 12 for that item will no longer apply, regardless of quantities released, since this reject rate can cause the release schedule to change."

Paragraph 11 is entitled "Delivery Schedule" and immediately following the title the words "Planning Purposes only" appear in parenthesis. The paragraph sets up a schedule of delivery dates beginning with 3-31-70 and ending with 4-30-71. The contract in paragraph 1 thereof apparently was for deliveries from 3 March 1970 through 3 March 1971. The delivery schedule provides for delivery of four of each item on 3-31-70 and provides for deliveries each month thereafter to and including 30 March

Circuits Co. v. Communications, Inc.

1971 and 30 April 1971—both dates presumably after the time for performance—and provides for a delivery of a total of 1004 of each item.

Paragraph 12 is entitled "Price Adjustment Schedule." It is the "bill back" clause referred to and provides:

"In the event Terminal Communications, Inc. does not purchase the estimated total quantity from March 3, 1970 through March 3, 1970 the following adjustment schedule will be applied. Terminal Communications, Incorporated will be invoiced for the difference between the price for the quantity range actually purchased and the lower initial price.

|           |         | Quantity |          |
|-----------|---------|----------|----------|
| Item No.  | 200-499 | 500-999  | 1000     |
| #0226     | 30.00   | 25.00    | 21.00    |
| #0227     | 30.00   | 25.00    | 21.00    |
| #0228     | 30.00   | 25.00    | 21.00    |
| #0229     | 30.00   | 25.00    | 21.00    |
| #0230     | 30.00   | 25.00    | 21.00."  |

It is obvious that the contract is ambiguous. The jury ascertained its meaning in favor of plaintiff upon an issue submitted without objection and without tender of an alternative issue. *Goodyear v. Goodyear*, 257 N.C. 374, 126 S.E. 2d 113 (1962). Ordinarily, "[t]he number, form and phraseology of the issues lie within the sound discretion of the trial court," and where the issue is "sufficiently comprehensive" to resolve the controversy, its submission will not be held for error. *Chalmers v. Womack*, 269 N.C. 433, 435-436, 152 S.E. 2d 505, 507 (1967). The issue submitted was sufficient to resolve the controversy arising upon the pleadings and the evidence.

Defendant contends that the court erred in charging the jury that under the evidence they might find that plaintiff's reasonably anticipated profit from the full performance of the contract was 10% of the total value of the contract. Plaintiff was allowed to testify in this vein, without objection by defendant. As we have previously noted, the charge contains no bracketed or otherwise identifiable portions to which defendant excepts. However, since the matter will be for retrial on the issue of damages, this question on this appeal is moot. Perhaps upon retrial defendant will, by proper objection, be able to prevent what it deems incompetent evidence from being presented to

---

**Land Co. v. White**

---

the jury. In any event, proper objection and exception in the record will allow the question to be presented on appeal.

Defendant also raises the question of the impropriety of the court's order reducing the verdict. This question has been discussed; and, as previously indicated, the error of the court results in the necessity of a new trial on the issue of damages.

New trial on damages issue only.

Judges VAUGHN and CLARK concur.