Jonah D. Cornett and Ralph Moore, Sellers, were potato farmers in DeKalb County, Alabama. Neumiller Farms, Inc., Buyer, was a corporation engaged in brokering potatoes from the growers to the makers of potato chips. The controversy concerns Buyer's rejection of nine loads of potatoes out of a contract calling for twelve loads. A jury returned a verdict of $17,500 for Sellers based on a breach of contract. Buyer appealed. We affirm.
From the evidence, the jury could have found the following:
On March 3, 1976, the parties signed a written contract whereby Sellers agreed to deliver twelve loads of chipping potatoes to Buyer during July and August, 1976, and Buyer agreed to pay $4.25 per hundredweight. The contract required that the potatoes be United States Grade No. 1 and "chipt [sic] to buyer satisfaction." As the term was used in this contract, a load of potatoes contains 430 hundredweight and is valued at $1,827.50.
Sellers' potato crop yielded twenty to twenty-four loads of potatoes and Buyer accepted three of these loads without objection. At that time, the market price of chipping potatoes was $4.25 per hundredweight. Shortly thereafter, the market price declined to $2.00 per hundredweight.
When Sellers tendered additional loads of potatoes, Buyer refused acceptance, saying the potatoes would not "chip" satisfactorily. Sellers responded by having samples of their crop tested by an expert from the Cooperative Extension Service of Jackson County, Alabama, who reported that the potatoes were suitable in all respects. After receiving a letter demanding performance of the contract, Buyer agreed to "try one more load." Sellers then tendered a load of potatoes which had been purchased from another grower, Roy Hartline. Although Buyer's agent had recently purchased potatoes from Hartline at $2.00 per hundredweight, he claimed dissatisfaction with potatoes from the same fields when tendered by Sellers at $4.25 per hundredweight. Apparently the jury believed this testimony outweighed statements by Buyer's agents that Sellers' potatoes were diseased and unfit for "chipping."
Subsequently, Sellers offered to purchase the remaining nine loads of potatoes from other growers in order to fulfill their contract. Buyer's agent refused this offer, saying ". . . `I'm not going to accept any more of your potatoes. If you load any more I'll see that they're turned down.' . . . `I can buy potatoes all day for $2.00.'" No further efforts were made by Sellers to perform the contract.
At the time of Buyer's final refusal, Sellers had between seventeen and twenty-one loads of potatoes unharvested in their fields. Approximately four loads were sold in Chattanooga, Tennessee; Atlanta, Georgia; and local markets in DeKalb County. Sellers' efforts to sell their potato crop to other buyers were hampered by poor market conditions. Considering all of the evidence, the jury could properly have found that Sellers' efforts to sell the potatoes, after Buyer's final refusal to accept delivery, were reasonable and made in good faith.
This case presents three questions: 1) Was Buyer's refusal to accept delivery of Sellers' potatoes a breach of contract? 2) If so, what was the proper measure of Sellers' damages? and 3) Was the $17,500 jury verdict within the amount recoverable by Sellers under the proper measure of damages?
§ 7-2-703, Code of Alabama 1975 (UCC), specifies an aggrieved seller may recover for a breach of contract "Where the buyerwrongfully rejects . . . goods . . ." (Emphasis Added) We must determine whether there was evidence from which the jury could find that the Buyer acted wrongfully in rejecting delivery of Sellers' potatoes.
A buyer may reject delivery of goods if either the goods or the tender of delivery fails to conform to the contract. §7-2-601, Code of Alabama 1975. In the instant case, Buyer did not claim the tender was inadequate. Rather, Buyer asserted the potatoes failed to conform to the requirements of the *Page 275 
contract; i.e., the potatoes would not chip to buyer satisfaction.
The law requires such a claim of dissatisfaction to be made in good faith, rather than in an effort to escape a bad bargain. Shelton v. Shelton, 238 Ala. 489, 192 So. 55 (1939);Jones v. Lanier, 198 Ala. 363, 73 So. 535 (1916); ElectricLighting Co. v. Elder Bros., 115 Ala. 138, 21 So. 983 (1896).
Buyer, in the instant case, is a broker who deals in farm products as part of its occupation and, therefore, is a "merchant" with respect to its dealings in such goods. §7-2-104, Code of Alabama 1975. In testing the good faith of a merchant, § 7-2-103, Code of Alabama 1975, requires ". . . honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." A claim of dissatisfaction by a merchant-buyer of fungible goods must be evaluated using an objective standard to determine whether the claim is made in good faith. Because there was evidence that the potatoes would "chip" satisfactorily, the jury was not required to accept Buyer's subjective claim to the contrary. A rejection of goods based on a claim of dissatisfaction, which is not made in good faith, is ineffectual and constitutes a breach of contract for which damages are recoverable.
We next consider the proper measure of damages under the UCC. One of the remedies available to aggrieved sellers is the recovery of ". . . damages for nonacceptance (section 7-2-708). . . ." § 7-2-703, Code of Alabama 1975.
The measure of damages available through § 7-2-708, Code of Alabama 1975, is:
 "(1) Subject to subsection (2) and to the provisions of this article with respect to proof of market price (section 7-2-723), the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this article (section 7-2-710), but less expenses saved in consequence of the buyer's breach.
 "(2) If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this article (section 7-2-710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale."
Buyer contends the jury verdict was excessive in view of §7-2-708 (1), Code of Alabama 1975. Based on a "per hundredweight" calculation, Buyer suggests the proper damage formula would be the difference between the contract price ($4.25 per hundredweight) and the "market price at the time and place for tender" (stipulated to be $2.00 per hundredweight); netting damages of $2.25 per hundredweight of potatoes in the rejected nine loads. We disagree.
On its face, the Code restricts the use of the subsection (2) measure of damages to those cases in which ". . . the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done. . . ." It is implicit within this provision, however, that, in order to employ the damage formula of subsection (1), there must not only exist a market for the contracted goods, but also the aggrieved seller must have a legal obligation to enter that market in his effort to avoid the foreseeable adverse consequences of buyer's breach of contract. Unless there is both a market and an obligation to enter it, the subsection (1) measure of damages is functionally inadequate and the aggrieved seller may seek redress through application of the measure of damages provided in subsection (2). See generally: TimberAccess Industries Co. v. U.S. Plywood-Champion Papers, Inc.,263 Or. 509, 503 P.2d 482 (1972). *Page 276 
In the instant case, at least some market for potatoes existed; but we must consider whether Sellers had a legal obligation to sell the rejected nine loads of potatoes in that market. Clearly, if Sellers had such an obligation, subsection (1) will control; and, if no obligation existed, Sellers may look to subsection (2) to provide the formula by which their damages are to be measured.
Generally, the damages recoverable by a nonbreaching party will be measured as though that party had made a reasonable effort to avoid the foreseeable adverse consequences of the breach. In doing so, however, the nonbreaching party is not required to expose himself to undue risk, expense or humiliation. Brotherhood of Railroad Trainmen v. Barnhill,214 Ala. 565, 108 So. 456 (1926); Whiting v. Dodd, 39 Ala. App. 80,94 So.2d 411 (1957). See also Restatement of Contracts § 336 (1) (1932). Moreover, the rule does not require an aggrieved party to sacrifice a substantive right or forego an advantageous opportunity for the benefit of the breaching party. Richard v. A. Waldman Sons, Inc., 155 Conn. 343,232 A.2d 307 (1967). See also 22 Am.Jur.2d, § 34, page 57.
The jury apparently concluded that, although Sellers made reasonable and diligent efforts to sell as many loads as possible, only four loads of potatoes could be sold of the seventeen to twenty-one loads in Sellers' fields, at the time of tender. To expect Sellers to give priority to selling those potatoes allocated to Buyer's contract, rather than selling the unallocated portion of their inventory, would be to require them to forego an advantageous opportunity and sacrifice a substantive right. Such is not the law. Had Sellers' inventory consisted solely of the potatoes allocated to Buyer's contract or had Sellers failed to act reasonably to sell their entire inventory, they would have failed to meet the obligation imposed by the avoidable consequences rule. However, under the circumstances here presented, Sellers had no obligation to enter the market with those potatoes allocated to Buyer's contract. Absent such a legal obligation, the measure of damages provided in § 7-2-708 (1), supra, is inadequate. Sellers may recover damages as measured by § 7-2-708 (2), Code of Alabama 1975.
The contested portion of Sellers' contract calls for the payment of $4.25 per hundredweight of potatoes contained in nine loads, each of which contained 430 hundredweight; totaling $16,447.50. Additionally, Sellers claim interest of $1,480.20 for eighteen months, and $62.00 freight expenses incurred due to Buyer's breach. They contend that the total amount which they might have recovered was $17,989.78; and that the jury verdict should stand, because it does not exceed this amount.
The subsection (2) damage formula allows Sellers to recover ". . . the profit (including reasonable overhead) . . . from full performance by the buyer . . incidental damages provided in this article (section 7-2-710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale." Under the facts of this case, we need not consider the ramification upon the subsection (2) damage formula of "due credit for payments," or "proceeds of resale." We now consider whether the jury's verdict is compatible with a damage award based on Sellers' "profit (including reasonable overhead)," "costs reasonably incurred" and "incidental damages" provided in § 7-2-710, Code of Alabama 1975.
The proper application of the subsection (2) measure of damages has received reflective consideration in R. Childres R. Burgess, Seller's Remedies: The Primacy of UCC 2-708 (2), 48 N YU.L.Rev. 833 (1973). The authors define profit as ". . . an economic term, expressed in dollar amounts, representing the excess of that received [or which ought to have been received] over that expended in the business transactions or operations, the latter being also expressed in dollar amounts." Childres Burgess, supra at 838.
The total amount expended in performance of a contract is composed of "fixed costs" and "variable costs." The "fixed costs," sometimes called "overhead," *Page 277 
are those relatively stable expenses which are essential to performance and which continue even if the performance of a specific contract is temporarily halted. Recovery of overhead, to the extent that it is reasonably incurred, is specifically allowed as part of the award for profit by subsection (2).Childres Burgess, supra at 846.
The "variable costs" are those expenses, incurred in reliance on the contract, which may be identified to a specific contract and which, if the contract were not to be performed, could be avoided. This element usually includes such items as the costs of material and labor which go directly to the production of the contract goods. If the breach occurs at a time when the aggrieved seller has already incurred variable costs, recovery for these damages is allowable as part of "costs reasonably incurred" under subsection (2). Childres Burgess, supra at 860. We note, however, that the variable costs which an aggrieved seller might have avoided by diligent and reasonable efforts are not "reasonably incurred" and may not be recovered under § 7-2-708 (2), supra.
Suffice it to say that there is evidence in the record from which the jury could reasonably conclude that the Sellers substantially performed their part of the bargain and had incurred substantially all of the expenses incidental to performance on their part. This being so, the jury's verdict of $17,500 was within those damages recoverable by Sellers as a consequence of Buyer's breach of contract.
AFFIRMED.
TORBERT, C.J., and MADDOX, JONES and BEATTY, JJ., concur.