BEAD CHAIN MANUFACTURING COMPANY *v.* SAXTON PRODUCTS, INC.

BOGDANSKI, PETERS, HEALEY, ARMENTANO and WRIGHT, Js.

Argued January 9—decision released March 3, 1981

*Prescott W. May,* with whom, on the brief, was *Arthur J. O'Neill,* for the appellant (defendant).

*Joseph T. Gormley, Jr.,* for the appellee (plaintiff).

PETERS, J. This is an action for the breach of a contract for the purchase of specially manufactured electronic parts. The plaintiff, The Bead Chain Manufacturing Company, the seller, sued the defendant, Saxton Products, Inc., the buyer, for failure to accept delivery of goods tendered pursuant to the contract of sale, and for failure to pay related costs and damages. The defendant denied the plaintiff's allegations and entered both special defenses and a counterclaim. After a trial to the court, judgment was rendered for the plaintiff on the complaint and on the counterclaim, and this appeal followed.

The underlying facts are not, on this appeal, in dispute. After more than a year of discussion, negotiation, and examination of handmade samples, the defendant Saxton in January, 1973, sent to the plaintiff Bead a purchase order for five million electrical components known as female contacts. The contract called for the production of special new

tooling for these newly designed parts. The purchase order described the material out of which the goods were to be made and specified that they were to conform to "Sketch S-1318." A month later, a superseding design drawing was prepared by Bead and approved by Benjamin Jarmolow, Saxton's chief engineer and vice president. The idea for and the design of the female contacts was initially provided by Jarmolow who made some changes in it subsequent to the original submission. After receipt of the initialed drawing from Jarmolow in February, 1973, Bead began to prepare for production, by manufacturing the necessary tooling and producing preproduction samples in conformity with the initialed drawing.

Although the contract called for the first instalment of 250,000 contacts to be delivered by the middle of June, 1973, Bead first sent 100 preproduction samples to Saxton for its approval in August of that year. These samples were lost. When this loss came to light upon inquiry by Bead, further preproduction samples were delivered in October, 1973, and February, 1974. Small instalments, 1000 each, of finished contacts were delivered in April and May of 1974. Until July, 1974, Saxton neither rejected any of these tenders nor made any complaint about their conformity with Jarmolow's design or about their timeliness. In July, confronted with a bill for the costs of tooling, Saxton for the first time stated that the contacts were defective because they lacked "memory" characteristics, i.e., the ability to return to their original shape after having been deformed. "Memory" characteristics were, according to Saxton, essential to the incorporation of this component in the electrical

products which Saxton intended to market and to sell. Saxton never suggested what specific design modifications would be required to make the contacts acceptable. Further discussions proved fruitless, and this lawsuit ensued.

The trial court, after extensive proceedings, found all of the issues for the plaintiff, the seller Bead. It concluded that the contract required Bead to provide electrical contacts in accordance with the specifications in the initialed design drawing, rather than requiring Bead to design the contacts subject to the buyer Saxton's approval. Essentially, the court concluded that the basic responsibility for design rested with Jarmolow, Saxton's engineer, while Bead's responsibility was to manufacture goods in conformity with that design. The court also interpreted the contract's provision that tooling for these contacts was to be reserved for the "exclusive use" of Saxton, the court holding that despite Saxton's obligation to pay for the tooling, Bead was not required to turn over the tools it had made, but merely to segregate the tools for Saxton's use. Finally the court determined that Saxton could not rely on contract provisions making time of the essence with regard to Bead's performance, when Saxton, by its conduct, had waived compliance with the delivery dates specified in the purchase order. Having thus concluded that Saxton was in breach in refusing to accept the tendered female contacts and in refusing to pay the tooling charges stipulated in the purchase order, the court awarded the plaintiff Bead damages in the amount of $8411 plus interest and costs. The defendant Saxton's appeal challenges each of these conclusions, in whole or in part.

Before we address the merits of the defendant's claims of error, we must observe that this case has been presented with virtually total disregard of the relevant provisions of our statutes, in particular Article 2 of the Uniform Commercial Code, General Statutes § 42a-2-101 et seq. While it is true that the Code incorporates, by reference, supplementary general principles of contract law and of the law merchant, § 42a-1-103, such supplemental bodies of law cannot displace those provisions of the Code that are directly applicable. Article 2 applies to all contracts for the sale of goods, whether those goods be existing at the time of sale or whether, as in this case, they are to be specially manufactured. See, e.g., §§ 42a-2-106 (1); 42a-2-201 (3) (a); 42a-2-704 (2).

The defendant's first claim of error challenges the court's conclusion that the defendant waived contract provisions concerning the time for delivery. The defendant's purchase order made time of the essence, providing, "[t]he dates of delivery in quantities herein specified are of the essence of this order, and delivery must be effected within the time specified. If deliveries are not made on time and in the quantities specified, Buyer reserves the right to cancel and to purchase elsewhere and hold Seller accountable therefor." At the trial, the defendant relied on this provision both as a defense to the plaintiff's claim for damages and as the basis of its counterclaim. We agree with the trial court that this clause, in the circumstances of this case, neither excused the defendant's nonperformance nor supported its own cause of action "because the defendant did not exercise its right to cancel in a timely fashion."

Under the Uniform Commercial Code, "[r]ejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller." General Statutes § 42a-2-602 (1). Although a buyer must be afforded a reasonable opportunity to inspect goods to determine whether they should be rejected; §§ 42a-2-606 (1) (b); 42a-2-513 (1); he must exercise his right to inspect in a timely fashion. Section 42a-2-602 establishes a policy that requires the buyer to act with reasonable speed in determining whether to reject and requires prompt implementation of rejection by notification to the seller. See White & Summers, Uniform Commercial Code (2d Ed.) § 8-3, p. 309. The parties, in their contract, may establish guidelines to determine whether any action required by the Code has been taken within a reasonable time, but their agreement may only fix a time period "which is not manifestly unreasonable." § 42a-1-204 (1).

Applying these statutory provisions to the case before us, we conclude that Saxton's protracted delay in rejecting the contacts tendered by Bead, coupled with its delay in notifying Bead of their alleged nonconformity, obligated Saxton to accept those deliveries. It would be manifestly unreasonable, in the circumstances of this case, to permit a printed time-is-the-essence clause in Saxton's contract form to extend for six months or more its opportunity to inspect and to reject. Cf. *Neville Chemical Co.* v. *Union Carbide Corporation*, 422 F.2d 1205 (3d Cir. 1970); *Q. Vandenberg & Sons, N.V.* v. *Siter*, 204 Pa. Super. 392, 204 A.2d 494 (1964). As White and Summers point out (p. 312), one of the relevant factors in determining timeliness is the course of performance between the parties

after the sale but before the formal rejection. This course-of-conduct factor in effect incorporates the common law principles of waiver which the trial court found persuasive in this case. See, e.g., *O'Loughlin* v. *Poli,* 82 Conn. 427, 437, 74 A. 763 (1909). Contrary to the defendant's assertion, Saxton's silence in the face of Bead's deliveries now precludes it from complaining about defects, such as delay in delivery, that were readily apparent at the time of tender.[1]

The defendant's second claim of error argues that the trial court misinterpreted the provision of the purchase order which requires the buyer Saxton to pay Bead $3475 as fitting-up charges for tooling and gives Saxton "exclusive use without limitation of the part as shown in Sketch S-1318." The court held that this provision entitled Saxton to exclusive use only, and not to ownership, of the tools manufactured by Bead to produce the contacts. We agree.

The defendant relies on a printed provision in its purchase order that all tools "furnished or specifically paid for by buyer, shall be the property of the buyer . . . ." The trial court may have found ambiguity in the relationship between this printed term and the typed clause on the second page of the purchase order expressly limiting Saxton's rights to exclusive use. The court's conclusion resolved this ambiguity in favor of the plaintiff Bead because of an earlier letter by Jarmolow for Saxton that the defendant was "prepared to pay for any special tooling with the understanding that this part will be manufac-

---

[1] The defendant also adverts to a printed contract provision reserving to the buyer "[t]he right to reject any material which does not fulfill the specifications of the order or time of delivery." the implications of §§ 42a-2-602 and 42a-1-204.
This clause is as vulnerable as is the time-of-the-essence clause to

tured for our exclusive use." No claim is now made, nor was it made at trial, that this letter was improperly introduced into evidence. Even if the purchase order is regarded as an integration to which the parol evidence rule applies, such an integration does not preclude the introduction of prior statements that serve to clarify the meaning of the integrated contract. General Statutes §§ 42a-2-202 and 42a-1-103; *Panaroni* v. *Johnson,* 158 Conn. 92, 106, 256 A.2d 246 (1969); *Maier* v. *Arsenault,* 140 Conn. 364, 368, 100 A.2d 403 (1953); *Maltby, Inc.* v. *Associated Realty Co.,* 114 Conn. 283, 289, 158 A. 548 (1932); 3 Corbin, Contracts § 579 (1960); Restatement (Second), Contracts § 240 (c) (1973). Alternatively, the trial court may have concluded that the more specific typed provision superseded the more general printed provision in the defendant's purchase order, and that the ambiguity of its referent required explanation by recourse to the Jarmolow letter. *Miller Bros. Construction Co.* v. *Maryland Casualty Co.,* 113 Conn. 504, 514, 155 A. 709 (1931); *United Machinery Co.* v. *Etzel,* 89 Conn. 336, 340, 94 A. 356 (1915); 3 Corbin, Contracts §§ 547, 548; Restatement (Second), Contracts § 229 (1973). Under either theory, we cannot say that the trial court's interpretation of the contract constituted a reversible error.

The defendant's third claim of error is that the trial court could not reasonably have concluded that the defendant's conduct constituted a breach of the contract. The court found the defendant in breach for refusing to accept the parts shipped to it in 1974 and for refusing to pay the tooling charges. We have already noted that Saxton failed effectively to reject the goods tendered to it. Saxton's rejection

was wrongful[2] because, as the trial court found, the contacts that were tendered conformed to the design drawing initialed by Saxton's engineer, Jarmolow. Saxton might have bargained for a sale on approval; the trial court found that it had not done so.[3] A manufacturer of parts does not impliedly warrant that his goods will meet a buyer's special requirements unless, "at the time of contracting, the seller has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." § 42a-2-315. No such implied warranty was alleged or proven in this case. Absent a statutory warranty or definitive contract language, the determination of what the parties intended to encompass in their contractual commitments is a question of the intention of the

[2] The Uniform Commercial Code makes a distinction between a rejection that is ineffective and a rejection that is wrongful. An ineffective rejection is a rejection that is procedurally defective, the buyer having improperly delayed in rejecting the goods or, more typically, in notifying the seller. § 42a-2-602 (1). The consequence of an ineffective rejection is that the buyer is held to have accepted the goods; § 42a-2-606 (1) (b); and thereafter becomes liable for their purchase price. § 42a-2-607 (1). A wrongful rejection is a rejection that is substantively incorrect, the buyer having improperly asserted that a tender is nonconforming when in fact the tender meets the specifications of the contract of sale. The consequence of a wrongful rejection is that the buyer is in breach and the seller is entitled to invoke any of the remedies available to a seller aggrieved by a buyer's breach. § 42a-2-602 (3); § 42a-2-703. White & Summers, Uniform Commercial Code (2d Ed.) § 8-3, pp. 314–15. Operationally, the substantive scope of the buyer's right to reject is limited, and his rejection therefore more likely to be wrongful, when the contract of sale is, as here, an instalment contract. § 42a-2-612. Further exploration of these highways and byways must await another day.

[3] Under the provisions of General Statutes §§ 42a-2-326 and 42a-2-327, dealing with the sales on approval, it is, furthermore, doubtful whether the right to disapprove an otherwise conforming tender would have survived the protracted delay in its exercise.

parties, and an inference of fact. As an inference of fact, it is not reversible unless the trial court could not reasonably have arrived at the conclusion that it reached. *Otto Contracting Co.* v. *S. Schinella & Sons, Inc.,* 179 Conn. 704, 709, 427 A.2d 856 (1980); *Hydro-Hercules Corporation* v. *Gary Excavating, Inc.,* 166 Conn. 647, 653, 353 A.2d 714 (1974); *Bianco* v. *Darien,* 157 Conn. 548, 557, 254 A.2d 898 (1969); *Finlay* v. *Swirsky,* 98 Conn. 666, 671, 120 A. 561 (1923). That is not the case here.

The second basis upon which the trial court found the defendant to be in breach is equally persuasive. Saxton's refusal to pay the tooling charges arose out of its interpretation of the purchase order, its claim that it was entitled to a tender of the tools themselves. As we have discussed earlier in this opinion, the trial court held, and we agree, that Saxton's obligation to pay for tooling costs was not so conditioned. Its refusal to make this payment, upon demand, was therefore wrongful and a breach of the contract.

The defendant's remaining assignments of error challenge the calculation of the damages that were awarded by the trial court. The court found that the plaintiff Bead was entitled to recover: (1) fitting-up costs, $3475; (2) net out-of-pocket cost of beryllium copper, $1606; (3) selling and administrative costs, $330; and (4) lost profit, $3000, for a total of $8411. In addition the court awarded the plaintiff interest and costs. The defendant Saxton takes issue with each of the four items which the court included in its award of damages.

The defendant's argument about the fitting-up costs is repetitive of its earlier claim that Saxton was only obligated to pay for tooling in which it

was to acquire an ownership interest. As we have already noted, we concur in the conclusion of the trial court that this contract required Saxton to pay for tooling costs on the basis of a right to exclusive use rather than exclusive ownership. The amount of $3475 was therefore clearly recoverable.

The defendant claims that the court was in error in allowing recovery for the out-of-pocket costs incurred by Bead in procuring and then reselling the beryllium copper out of which the electrical contacts were to have been made. There was uncontradicted testimony that this material was specially purchased for this contract. The amount purchased was responsive to the needs to be anticipated for production of the 1,000,000 contacts initially ordered pursuant to Saxton's contract. Although a lesser amount of beryllium copper was resold than had been purchased, this shrinkage was explained as resulting from waste necessarily accompanying the preparation of early samples and the adaptation of the raw material to the production machinery. In its totality, this evidence amply supported the award of $1606 as an allowance for costs reasonably incurred in the performance of the contract of sale. See § 42a-2-704 (2).

The defendant's main attack on the damages award focuses on the last two items, selling and administrative costs, and lost profits. Had counsel directed the attention of the trial court to the relevant statutory provisions governing a seller's right to damages for nonacceptance or repudiation; §§ 42a-1-106; 42a-2-703 (e) ; 42a-2-708 (2) ; the court would have been able to articulate the basis for its award more precisely. This court's ability to review

fairly the proceedings in the trial court depends upon the cooperation of counsel and court to build an adequate record.

Several provisions of the Uniform Commercial Code relate directly to the measurement of damages here. In the case of breach by a buyer while the goods are still unfinished, the seller may, "in the exercise of reasonable commercial judgment . . . cease manufacture and resell for scrap or salvage value or proceed in any other reasonable manner." § 42a-2-704 (2). After manufacture has ceased, such a seller's damages are measured by "the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in section 42a-2-710," but less expenses saved in consequence of the buyer's breach. § 42a-2-708 (2). Although other classes of aggrieved sellers may also be entitled to measure their damages in accordance with this latter section, it is enough for this case to note that a seller of uncompleted components whose market is composed solely of the buyer in breach cannot adequately measure his damages in any other way. See, e.g., *Neumiller Farms, Inc.* v. *Cornett,* 368 So. 2d 272, 276 (Ala. 1979); *Industrial Circuits Co.* v. *Terminal Communications, Inc.,* 26 N.C. App. 536, 216 S.E.2d 919, 923 (1975); Childres & Burgess, "Seller's Remedies: The Primacy of U.C.C. 2-708 (2)," 48 N.Y.U. L. Rev. 833 (1973); White & Summers, Uniform Commercial Code (2d Ed.) § 7-10.

Under § 2-708 (2), then, Bead was entitled to recover from Saxton its anticipated net profit, plus those fixed costs which could be regarded as overhead. All the reported cases are in agreement that

"profit (including reasonable overhead)" is the equivalent of net profit plus overhead, or of gross profit[4] including overhead. See, e.g., *Unique Systems, Inc.* v. *Zotos International, Inc.*, 622 F.2d 373, 378 (8th Cir. 1980); *Neumiller Farms, Inc.* v. *Cornett*, 368 So. 2d 272, 276–77 (Ala. 1979); *Jericho Sash & Door Co.* v. *Building Erectors, Inc.*, 362 Mass. 871, 872, 286 N.E.2d 343 (1972); Childres & Burgess, supra, 846; White & Summers, supra, § 7-13, esp. 285–86. If sufficiently supported by the evidence, the court's award of $3000 for profits and $330 for selling and administrative expenditures falls readily within the mandate of the statute. As the court used the term "selling and administrative expenses," this term referred to items such as salaries that were part of the seller's fixed expenses.

In our review of the trial court's determination that lost profit and overhead were sufficiently established, we must bear in mind the Code's admonition that remedies should be liberally administered to approximate the benefits that would have flowed from full performance. § 42a-1-106 (1). In recognition of the fact that the plaintiff's difficulty in quantifying his damages often flows directly from the defendant's breach, the philosophy of the Code is to require that degree of proof of damages which

---

[4] In accounting terms, "gross profit" is the difference between revenues and variable costs attributable to the production of those revenues. "Net profit" is the difference between revenues and a sum representing both variable and fixed costs. Schematically, Price — Variable Costs = Gross Profit; Gross Profit — Fixed Costs = Net Profit. See Childres & Burgess, "Seller's Remedies: The Primacy of U.C.C. 2-708 (2)," 48 N.Y.U. L. Rev 833, 846–47 (1973).

the facts permit, but no more.[5]  See also Restatement (Second), Contracts § 366 (Tent. Draft No. 14, 1979).

Viewing the evidence in this light, we cannot say that the trial court erred in its determination of the amount of profits and overhead attributable to the contract in breach.  With regard to the loss of profits, Bead's president testified, without objection, about the elements he considered in pricing the job for Saxton.  Under the Code, it is not fatal that his cost and price estimates about the actual production run were necessarily theoretical, since Saxton's breach made it impossible to go forward with the production that would have made historically accurate figures available.  Our cases have, in fact, long acknowledged that opinion testimony is relevant evidence of loss of earnings and of goodwill. *Doeltz* v. *Longshore, Inc.*, 126 Conn. 597, 600–601, 13 A.2d 505 (1940); *Ball* v. *Pardy Construction Co.*, 108 Conn. 549, 551–52, 143 A. 855 (1928).  There is no reason why lost profits cannot be similarly established.  Bead's president based his estimates on his experienced view of the equipment that would be required, the difficulty of maintaining production, and the time required for the job.  Having taken account of these and related factors, he built a 20 percent profit into the contract price of $13.95 per thousand units.  The award of $3000 lost profits on

---

[5] Official Comment 1 to Uniform Commercial Code § 1-106, § 42a-1-106, states that one of its purposes is "to reject any doctrine that damages must be calculable with mathematical accuracy.  Compensatory damages are often at best approximate; they have to be proved with whatever definiteness and accuracy the facts permit, but no more."  Official Comment 2 to Uniform Commercial Code § 2-708, § 42a-2-708, states that "[i]t is not necessary to a recovery of 'profit' to show a history of earnings, especially if a new venture is involved."

a contract for 5,000,000 units at a total contract price of approximately $70,000 was therefore well within the supporting evidence.

There is no error.

In this opinion the other judges concurred.