[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
In this case the plaintiff was a long term employee of the defendant. She was terminated from her employment and has filed a suit in which she claims that her termination violated contractual rights she had to so-called progressive discipline set forth in a company personnel manual and that her termination represented an intentional infliction of emotional suffering upon her.
Certain facts are undisputed. The defendant did issue a personnel manual. The events leading to the plaintiffs dismissal arose out of the fact that she bought a car on credit and thought she had secured an approved bank loan. One day while she was at work she received what she claims were threatening and offensive calls from the car dealer and one of his employees. It seems the bank would not approve the loan without verification of the amount of her salary. The car dealer indicated he needed the verification immediately and if he did not receive this document he would send the police out forthwith to repossess the vehicle. The calls were stressful and the plaintiff was further upset at this time because of the death of her stepfather.
The plaintiff knew that the verification could only be obtained from the personnel department. She called that department and was told the verification letter could not be sent out until the next day. The plaintiff then requested a secretary to type a letter which would represent that it came from the appropriate company department. She then had a co-employee sign the letter as a representative of the personnel department which she and that employee knew to be untrue.
Shortly after this letter was sent to the car dealer by fax, CT Page 5370-II management learned what happened. She and the woman who signed the letter were told to report to a building separate from the one she worked in. She was called into a room by supervisory personnel and after a short meeting was fired. The other woman suffered the same fate. They were told to leave the premises and their belongings were secured by another employee from their work site and brought to them. These are the basic facts and further facts will be discussed during this decision.
The Court will not cite authority as to the well known standards to be applied on a motion for summary judgment. Such a motion cannot be granted if there is a genuine issue of material fact. If there is one the court can identify it but not try it. A complainant has a right to a jury trial. But where appropriate these motions should be granted to avoid the courts and litigants from being burdened with meritless claims.
Breach of Contract
A resolution of this claim requires a discussion of certain basic considerations. The legal consequences visited on employers as a result of issuing personnel manuals is still a developing area of the law in our state. Finley v. Aetna Life CasualtyCo., 202 Conn. 190, 199 (1987) first discussed the various considerations that arise in this area. The court said certain things and cited various cases which this court believes underline some of the problems unique to this subject. The Court at page 199 said:
 "The relevant statements in the defendant's personnel manual certainly could have been interpreted as non-contractual. In the absence of `definitive contract language', however, `the determination' of what the parties intended to encompass in their contractual commitments is a question of the intention of the parties, and an inference of fact." Bead Chain Mfg. Co. v. Saxton Products, Inc., 183 Conn. 266, 274-275, 439 A.2d 314 (1981). In this case, therefore, whether the defendant's personnel manual gave rise to an express contract between the parties was a question of fact properly to be determined by the jury. See Toussant v. Blue Cross, 408 Mich. 579, 613-614, 292 N.W.2d 880
CT Page 5370-JJ (1980); Pine River State Bank v. Mettle, 33 N.W.2d 622, 628 (Minn., 1983); Werner v. McGraw-Hill, Inc. N.E.2d 441, 457 N.Y.S.2d 193
(1982).
In a footnote on the same page the court noted the fears expressed in an amicus brief by the Connecticut Business and Industry Association that a decision in Finley against the employer would make every termination a potential jury trial. The court said the fear was "unfounded" — "By eschewing language that could reasonably be construed as a basis for a contractual promise or by including appropriate disclaimers of the intention to contract, employers can protect themselves against employee contract claims based on statements made in personnel manuals." But the language in the manual purportedly "eschewing" contract language or setting forth "appropriate disclaimers" is, like any other language purporting to establish contractual obligations, subject to interpretation. In effect then, many appellate cases will have to be generated before those words of art are discovered which will guarantee that trial judges on motions to strike or for summary judgment will in effect take the appropriate cases from a jury forum.
What perhaps concerns business interests is the fact that the interpretative faculties of the courts are to some extent influenced by a reaction to what is perceived as the harsh consequences of the at will employment rule which permits workers to be terminated for any reason, good or bad, related or not even related to job performance. In some quarters, this rule is viewed as a product of the nineteenth century laissez faire attitudes that is both disruptive of industrial peace and economic productivity. The courts themselves have restricted the operation of the rule by creating, for example, the public policy exception to the rule as set forth in Sheets v. Teddy's Frosted Foods Inc.,179 Conn. 471 (1980) and by cases such as Finley itself which permit personnel manuals to form the basis for finding a contractual relationship.
Two cases cited in Finley, however, indicate we are not dealing with the ordinary operation of principles of contract formation in the employment discharge area. In Weiner v.McGraw-Hill, Inc. Supra at 453 N.Y.S.2d at p. 197 the court cites a statement in Corbin at Vol. 1A, Contracts § 152, p. 14:
"[I]f the employer made a promise, either CT Page 5370-KK express or implied, not only to pay for the service but also that the employment should continue for a period of time that is either definite or capable of being determined, that employment is not terminable by him `at will' after the employee has begun or rendered some of the requested service or has given any other consideration * * * This is true even though the employee has made no return promise and has retained the power and legal privilege of terminating the employment `at will'. The employer's promise is supported by the service that has begun or rendered or by the other executed consideration."
This language is resonant of unilateral contract formation based more strictly on reliance theories rather than the ordinary rubric of express and implied contract law which talks in terms of bargained for agreements by both sides. This seems to be even more explicitly stated in another case cited by Finley, Toussantv. Blue Cross/Blue Shield, supra at 292 N.W.2d page 892 where the court was interpreting the legal effect of a personnel manual:
 "We hold that employer statements of policy, such as the Blue Cross Supervisory Manual and Guidelines, can give rise to contractual rights in employees without evidence that the parties mutually agreed that the policy statements would create contractual rights in the employee, and, hence, although the statement of policy is signed by neither party, can be unilaterally amended by the employer, and contains no reference to a specific employee, his job description or compensation, and although no reference was made to the policy statement in pre-employment interviews and the employee does not learn of its existence until after his hiring."
What perhaps is even more illuminating is the earlier language of the court giving the theoretical basis for this holding:
"While an employer need not establish CT Page 5370-LL personnel policies or practices, where an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced. The employer secures an orderly, cooperative and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly. No pre-employment negotiations need take place and the parties minds need not meet on the subject; nor does it matter that the employee knows nothing of the particulars of the employer's policies and practices or that the employer may change them unilaterally. It is enough that the employer chooses, presumably in its own interest, to create an environment which the employee believes that, whatever the personnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee. The employer has then created a situation "instinct with an obligation." id p. 892.
As noted Finley cited these cases and in fact based its holding on them so that they can obviously not be ignored by the court. The court will discuss the issues raised by this case in the context of the foregoing discussion.
1.
In light of Toussant v. Blue Cross/Blue Shield, it is irrelevant to the issue of contract formation that the plaintiff here did not receive or perhaps more accurately does not remember receiving the personnel manual at the time she was hired. Also, it misses the point to say that the portions of the personnel manual dealing with discipline and on which she bases her contract claim were not specifically bargained over with both sides assuming mutual obligations. The assurance of these personnel manuals are unilateral ventures in any event often designed to enhance worker loyalty by the promise of job security and fair and uniform treatment. Whether the manual in this case can be said to do that in such a away so as to conclude there was a contract created thereby is a separate consideration from the CT Page 5370-MM fact that it was unilaterally issued and not bargained over. But it is also true that if a discharged employee was completely unaware of the personnel manual or any of the policies effectuated by it then it would in fact be difficult to find that a personnel manual could be the basis of a breach of contract claim based on a violation of progressive discipline. Not only would it be difficult to find mutual agreement under express and implied contract theory but it can hardly be claimed that the discharged worker somehow relied on such a policy explicitly communicated to workers while in the course of their employment. Such a situation would be analogous to manuals not intended or maintained for all employees but only for supervisory personnel.Carbone v. Atlantic Richfield Co. 204 Conn. 460, 472 (1987),DaCosta v. Aetna Life Ins. Co. 1 Conn. Ops 101 (1995). This is the issue the Court will now consider.
Factors the defendant maintains should be considered against the plaintiff's claim on this specific issue are based largely on her deposition testimony. The defendant presents some of her statements as admissions. The plaintiff has chosen to respond by arguing that the statements are presented out of context and has offered the whole deposition, adopted by the plaintiff under oath, without even pointing to specific portions of the deposition that might support her position. This is perhaps somewhat unusual especially since no affidavits were presented by the plaintiff focusing her claims. But I suppose the defendant's attack invites this response because it relies on specific portions of the deposition to the exclusion of others.
In any event the defendant points to a response by the plaintiff where she said she did not believe she had a contract with the defendant. This "admission" is contradicted by other matters in the record and the deposition, which the court will soon note, but in any event the court cannot give great weight to a legal conclusion made by this lay witness. More perhaps to the point, the defendant points to that portion of the deposition testimony where Ms. Manley said she did not have any memory of having read the section of the personnel manual dealing with progressive discipline. She read portions of the manual having to do with attendance, sick day policy, long term and short term disability. The most telling evidence against the plaintiff's position, at least to the court, is her statement upon being asked to read the portions of the manual having to do with discipline and termination. She basically said at her deposition that this meant the defendant could terminate her at any time it CT Page 5370-NN chose to do so.
But there are other matters brought out in the deposition which argue against granting the motion for summary judgment based on the issue now being discussed. At some point the plaintiff was given the manual and told to read it when she got a chance. At one point in her deposition, in response to a question that sought to recapitulate her previous answers to the effect that she only remembered consulting the manual as to the above mentioned specific areas, Ms. Manley said:
 "A. A lot of times, if I wanted to know something, I would ask someone else, another employee, but . . ." (p. 45)
This is an interesting response since the corollary inference is that talking to fellow workers is one way she could "know something" about her job but also looking at the personnel manual was a way to "know something" about her job. In fact this response parallels an answer to one of the interrogatories made under oath by the plaintiff. She stated that the personnel manual was the document she relied upon for her contract claim and said: "This document is routinely made available to all permanent employees. We work under the assumption that it defines our rights in the employment relationship." These responses obviously contradict other responses made by the plaintiff and previously referred to by the court but I cannot say that a genuine issue of material fact is not raised as to the narrow issue of whether the plaintiff was aware of any rights she might have had to progressive discipline if not through reading the manual at least by her reliance on the knowledge of the employee community as to that right necessarily created by the issuance of the manual. It is interesting to note that in the portion of the deposition where the plaintiff was questioned concerning the meeting where she was fired, her incessant theme was that she was not allowed to explain anything but she also said she was not given any warnings. This indicates she was aware of progressive discipline procedure. All of these factors distinguish this case from Hoytv. National Council on Compensation Ins. Inc., 2 Conn. Ops 500 (1996).
2.
Another issue here is whether the wording of the personnel manual avoids language "that could reasonably be construed as a CT Page 5370-OO basis for contractual promise" Finley v. Aetna Life CasualtyCo., 202 Conn. at page, 199, footnote 5. This question is in large measure one of fair notice to the employee. I agree with the defendant that the disclaimer language in this manual was not unfairly buried in the contract so as to preclude the employer from relying on it. It is not in fine print or placed at the end of the manual or concealed in the middle of the materials in language completely unrelated to the message it tries to convey. The disclaimer is on the second page of written material after the index and a welcoming statement by the company president. It is in the third paragraph of the first substantive section of the manual. The purported disclaimer language cannot be dismissed then on the basis that it does not give proper notice to employees, ct Ellift v. St. Vincent's Medical Ctr. 9 CSCR 113
(1993), Dicker v. Middlesex Memorial Hospital, 9 CSCR 413 (1994),Hoyt v. National Council on Compensation Ins., Inc., supra.
The question remains as to whether the language relied upon by the employer for disclaimer effectively serves that purpose. Or to put it another way, can the court rule as a matter of law that the language used here serves as a fair and adequate disclaimer of an intention to avoid contractual promise? The relevant language appears tin two paragraphs under a hearing entitled: "How to Use Your Hand Book".
 This handbook is intended to provide you with much of the information you will need during your employment. It should not be construed as a legal document or contract. Any required governing documents are kept on file in Human Resources and are available for your review. Although the Company has every intention of continuing the policies and practices described in this handbook, it reserves the right to alter or discontinue them at any time should changing conditions make such action necessary. Ample notice will always be provided to employees in this event. When you receive new or replacement pages, you are encouraged to insert the updated material to insure that your handbook remains current.
 Please complete the card located in the inside cover of your handbook and return it to your manager. This card acknowledges your CT Page 5370-PP receipt of the handbook and will be retained in your personnel file.
This language should be compared to the language in two cases cited by the defendant where the disclaimer language was held sufficient to permit the court to find that the personnel manual did not constitute a contractual promise, Grieco v. HartfordCourant Co. 8 CSCR 219 (1993), Hoyt v. National Council onCompensation Insurance 2 Conn. Ops 500 (D.Conn., 1996). InGrieco, the court referred to the following language:
 "This handbook summarizes the Hartford Courant's major personnel policies and practices. The handbook and any of the statements made herein are not to be construed as nor is it a contract between the Hartford Courant and its employees. Policies and practices are subject to change at the discretion of the Hartford Courant."
In Hoyt the court referred to the langauge from the personnel manual:
 "NCCI's handbook contains two disclaimers. First, under the section entitled "The Employment Relationship", it states: NCCI considers its employees to be very important and makes every effort to provide stability of employment. However, the hiring of an employee does not create a contractual relationship between the employee and the Council and, unless otherwise provided in writing, the employment relationship is defined as `employment at-will,' which allows either party, with appropriate notice, to dissolve the relationship.(See Hoyt Dep. Ex. 15 at 5.) Second, in the Employee Conduct section, the handbook reads: This list of offenses is also distinct from the high standards of employment that NCCI expects from all employees. NCCI strives to provide its employees with a fair and positive employment environment. However, employees must recognize that their employment may be terminated at the sole CT Page 5370-QQ discretion of either the Council or the employee."
The disclaimer in Hoyt is, as the court writes, in the very section upon which the plaintiff based her contract claim. That is not the case here. There is not as in this case a brief sentence to the effect that the handbook is "not to be construed as a legal document or contract" — whatever that may mean to a lay employee. In Hoyt the disclaimer language gets right to the heart of the matter. The first disclaimer not only says a contractual relationship is not created but then says that unless otherwise provided for in writing the relationship is one of employment at will and either party can thus dissolve the relationship. The second disclaimer explicitly says the employer can terminate employment in its "sole discretion."
Even the language in Grieco, which is similar to the language used in this case in that it does not explicitly refer to the employer's right terminate at will, says policies and practices, including obviously those set forth in the handbook, are subject to change at the Hartford Courant's discretion.
In this handbook the language is somewhat more ambivalent. The following sentence underlines that for the court: "Although the Company has every intention of continuing the policies and practices described in this handbook, it reserves the right to alter or discontinue them at any time should changing conditions make such action necessary. Ample notice will always be provided to employees in this event." What can this possibly mean? We do not even have the rather crisp — its in our discretion — language of Grieco. Here we see wording to the effect that the company has the intention of continuing the policies and practices in the handbook. Of course, the company reserves the right to alter or continue these policies but only if "changing conditions" make such actions necessary. Then in what might be described as the crowning touch of ambiguity the "disclaimer" says, if we do make changes "ample notice will be always be provided to employees". Doesn't that mean until notice is provided the prior policies and practices remain in effect? Isn't that a reasonable construction?
Use of what the Court respectfully suggests is cat and mouse language will not permit this issue to be resolved as a question of law. The Court understands companies have to walk a thin line between having personnel manuals give some sense of security and fair play in the workplace and not having them create contractual CT Page 5370-RR relationships. But this is not an insuperable problem for businesses especially those with access to counsel and often in-house counsel. The language in the Hoyt case is easy to draft and offers protection absolute. There the manual explicitly states that the company can still terminate at will and for good measure, a la Grieco, can change everything in the manual at its discretion without any mention of it. If that is what is meant, it should be said and it can be easily said. Language short of that creates confusion for workers and ultimately extra legal expense for businesses since whether there will be a resolution short of trial depends on how a particular judge in a particular courthouse interprets a particular word or phrase.
3.
The defendant also contends that the handbook language relied upon by the plaintiff is not contractual in nature. The general principle referred to is cited in Dunham v. Dunham, 204 Conn. 303,313 (1987); "Under established principles of contract law, an agreement must be definite and certain as to its terms and requirements," cf D'Ulise v. Board of Directors of Notre DameHigh School, 202 Conn. 206, 214 (1987), to support contractual liability language must be "sufficiently promissory" and/or "sufficiently definite."
This language, however, because of its generality can be taken too far. As one commentator has noted:
 ". . . [U]nder the traditional rule where the parties have purported to agree upon a material term and left it indefinite, the agreement is considered to be too vague and indefinite. But if the parties are silent as to (a) material term or discuss the term but do not purport to agree upon it and do not condition their agreement upon an agreement as to this term, there is a strong possibility that the term may be implied from surrounding circumstances or supplied by a court using a gap-filler."
The Law of Contracts, 3d ed (1987), Calamari Perillo, § 2-9
(a)(2), p. 56, cf this process in U.C.C. provisions, see § 42a-2305, 2-306, and 2-309. These observations apply to the classic bilateral contract situation and, as Calamari Perillo note in the same section at page 59, employment contracts are in the main treated differently. Thus, . . . "in employment CT Page 5370-SS contracts, if no duration term is provided either expressly or by implication, a majority of the courts have refused to fill the gap and have held that the hiring is at will (either party may terminate at will) even if the parties have set the compensation at a specified sum per month, day or year." But the commentators go on to note that "an appropriate evidentiary showing of surrounding circumstances may change the result" and go on to cite the case cited with approval in Furley, Weiner v.McGraw-Hill, Inc., 457 N.Y.S.2d 193, 198 (1982).
The defendant claims here that the language in the handbook purporting to set up progressive discipline is not contractual in nature; it is too vague and illusory. The relevant language of the handbook states the following:
 "Most job related problems can be solved by working together. Depending on the nature of the problem, additional training or other special assistance may be provided in order to give an employee every opportunity to improve.
 Normally the disciplinary process develops in three stages.
 • Initially, the manager discusses a potential employee area with an employee.
 • If the situation becomes a problem and has not been resolved through counseling, a verbal warning is issued, and expectations for improvement within a specified time period are established.
 • Failure to meet acceptable standards will result in a written warning with the understanding that the continuation of the problem will result in termination.
 The formal disciplinary process will begin with the second stage (verbal warning) when appropriate. Similarly, if a problem by its very nature is serious enough to warrant immediate termination, none of the three stages of the disciplinary process will apply. Verbal and written warnings issued in the second and third stages become a part of the employee's personnel record. Warnings are removed from the personnel record upon improvement within the established time period." CT Page 5370-TT
The following section then states "under normal circumstances an employee on written warning involving a specific period of time" is not eligible for a variety of benefits, which are then listed, while the warning remains in effect. A final section states: "Actions which can result in termination include, but are not limited to:" a variety of matters are then listed which range from the specific: "failure to meet bonding qualifications," to the very general: "unsatisfactory job performance" and also includes: "Falsification of employment subscriber or company records;" "Fraud or dishonesty."
At this point it is instructive, at least to the court, to compare the handbook language Judge Nevas reviewed in Hoyt v.National Council on Compensation Insurance Inc., supra, and which led him to conclude that a contractual promise to use progressive discipline was not made by the employer in that case. There the manual in an employee conduct section set forth two groups of offenses which "are not intended to be all-inclusive or restrictive, but are to be considered as examples of possible infractions and appropriate corrective action in such cases." Group II then provides in relevant part:
 "These offenses are serious and may or may not result in discharge, but certainly will require strong disciplinary action. Verbal warnings, written discussion, and/or other disciplinary actions may be used in these cases."
One of the offenses which allegedly covered the conduct inHoyt then was listed:
 "12. Abusive or indecent language which is offensive to employees or customers."
Turning back to the language in the manual before the court, the language of the first paragraph, quoted above, does not interject the elusiveness that the defendant suggests. The "problems" referred to in that paragraph appear to be the type of problem that would not lead to termination in any event. Besides, to say the language in this paragraph is elusive begs the question as to whether, if a type of conduct could contractually be determined to warrant the possibility of dismissal, progressive discipline would be mandated.
The problem with the language in Hoyt for the purpose of CT Page 5370-UU finding the basis for a contractual promise, is that it appears to say that any type of so-called Group II conduct may or may not be subject to progressive discipline solely at the employer's whim.
Here, in the second paragraph, the language says "normally" progressive discipline develops in three stages. The only conduct which need not be put into progressive discipline is conduct "serious enough to warrant immediate termination." In other words, but for that type of conduct, progressive discipline is mandated. The previous use of the word "normally" then merely refers to the fact that certain types of conduct may warrant "immediate termination" whereas other types of conduct even of the same category or general description do not, even if termination may eventually result through the application of progressive discipline.
There would be no contract violation here then if, given the circumstances of this case and/or the way similar transgressions were handled in the past, the conduct can be categorized as of such a serious nature that the defendant was warranted in terminating the plaintiff without progressive discipline. The defendant of course would be able to argue general policy considerations to and its business interests dictated such a course and as long as it establishes a prima facie case for such a position the plaintiff may very well have a difficult time prevailing on her claim. But it is not for a trial court to decide what in effect is an issue of fact.
The final argument advanced by the defendant underlies, at least for the court, the difficulty of the defendant's position given the language of the handbook. It is argued that leaving aside all the arguments previously made and assuming they're not accepted, the defendant is still entitled to judgment because "the handbook gives examples of the kind of conduct which was considered sufficiently serious to result in immediate termination." The defendant refers to the general catchall list quoted above which appears at the end of the discipline section. But nowhere in the handbook does it say the listed matters are by their very nature so serious that immediate dismissal is warranted. They are not referred to as "serious" infractions or the type of infraction not "normally" handled through progressive discipline. In fact, such an argument would, for all practical purposes, make the purported protections of the handbook a sham. In other words, the whole universe of worker activity is included CT Page 5370-VV in the listed transactions — one of them in fact is "unsatisfactory job performance." By saying "normally" progressive discipline is used but it is not used where the infraction is of a serious nature the common sense reading would be that there are some offenses so serious and therefore threatening to company interests or worker safety that immediate discharge is permitted but other matters, although they are infractions which may lead to discharge as a result of the progressive discipline process, do not justify immediate dismissal.
The position the court is now taking would not even preclude summary judgment procedure by the defendant. It would merely have to explain why what the plaintiff did here is of such a serious nature that immediate termination is required. It could point to how such activity might harm relationships with outside businesses or individuals or harm worker integrity. It could point to the fact that similar cases were handled similarly in the past. This still may place a burden on the defendant it does not want to assume but the answer to that is to reword the language of the handbook so as to make clear that progressive discipline and whether it is resorted to is in the sole discretion of the employer no matter what the nature of the employee infraction is or how such infractions were handled in the past. Of course, that might undercut the value of the handbook as a morale booster but companies cannot have the advantage of at will termination while being permitted to use language in their employee manuals permitting workers to believe they have more security than that doctrine affords. The answer is for skilled counsel, like the one handling this motion for the defendant, to review documents such as these before they are released — not an insurmountable or unreasonable requirement.
INTENTION INFLICTION OF EMOTIONAL DISTRESS
In Petyan v. Ellis, 200 Conn. 243, 253 (1986), the court recognized the tort of intentional infliction of emotional distress and adopted the guidelines set forth in 1 Restatement (Second) Torts § 46 and Murray v. Bridgeport Hospital,40 Conn. Sup. 56, 62 (1984). It must be shown that (1) the actor intended to inflict emotional distress or that the actor knew or should have known that emotional distress was the likely result of his or her conduct; (2) the conduct was extreme or outrageous; (3) the defendant's conduct was the cause of the plaintiff's distress; and (4) the emotional distress sustained by CT Page 5370-WW the plaintiff was severe.
If for the purpose of discussion it is assumed that the first, third and fourth requirements have been met so as to avoid a summary judgment motion, the court has difficulty with concluding that the same result should be reached as to the second requirement that the conduct being extreme and outrageous. In this case, the plaintiff has only submitted a copy of her deposition and response to interrogations.
What is conduct which is extreme and outrageous? In comment (d) of § 46 of the Restatement, it says:
 "Liability has been found only where the conduct has been so outrageous, uncharacteristic, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one which the recitation of the facts to an average member of the community would arouse his (sic) resentment against the actor, and lead him (sic) to exclaim, `Outrageous!'"
Prosser says:
 "The rule which seems to have emerged is that there is liability for conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind."
The plaintiff takes the position that summary judgment is inappropriate for issues of motive, intent, and subjective feelings and reactions. That may be true where the dispute is over whether a defendant's conduct caused emotional distress, the severity of that distress and the defendant's intention. But the court believes a threshold requirement must be met on the allegation of extreme and outrageous conduct before it can be said to be a jury question. In Petyan v. Ellis, itself the court upheld the trial court's directing of a verdict for the defendant holding that as a matter of law it agreed "with the trial court's conclusion that the defendant's conduct could not be considered outrageous," 200 Conn. At p. 254. The Restatement says at § 46, Comment h:
"It is for the court to determine, in the first CT Page 5370-XX instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable men (sic) may differ, it is for the jury, subject to the control of the court, the conduct has been sufficiently extreme and outrageous to result in liability."
Cf. Olumide v. Travelers Inc. Co., 1994 WL 0505575.
The cases cited by the plaintiff are not convincing on the issue as to whether, as she states, the extreme or outrageous character of the defendant's conduct can never be a question of law so as to preclude summary judgment.
In Berry v. Loiseau, 223 Conn. 786, 807 (1992), the court merely refused to set aside a verdict in favor of the plaintiff on this tort where the defendant's claim was that the plaintiff only presented his own testimony. In Hansen v. Berger,9 CSCR 1243 (1994), the court held that summary judgment should not be granted on a claim of intentional infliction of emotional distress where it was argued the conduct was not extreme or outrageous as a matter of law. The court merely cited the law to the effect that such a motion is inappropriate where issues of intent, motive and subjective feelings and reactions are involved. But that is not precisely on point when the issue is not whether the actor had the requisite intent or the defendant suffered distress but whether the precise conduct is of such a character as to meet the threshold requirement that it be sufficiently outrageous before the matter is sent to a jury. InHansen, the discharged employee was subjected to profanity and had his job performance subjected to defamatory criticism. Lugov. Rodrigues, 8 CSCR 244 (1992), involved a claim made under this tort but the issue before the court was whether the defendant had the intent to commit the tort, not whether his conduct was extreme and outrageous.
The New York cases cited by the plaintiff also do not persuade the court that summary judgment is never appropriate when the issue raised is whether the conduct alleged could be said to be extreme and outrageous. Halio v. Lurie, 222 N.Y.S.2d 759,764 held it was for a jury to decide whether the conduct alleged was extreme and outrageous. But the motion before the court was a motion to dismiss the complaint. The conduct alleged was also calculated to cause emotional distress. An immigrant CT Page 5370-YY woman was written a letter by a former suitor who, unbeknownst to her, was dating another whom he eventually married. The letter obnoxiously taunted and ridiculed the plaintiff and was sent in such a way that her whole family would be aware of it. Flatley v.Hartman, et al., 525 N.Y.S.2d 637, 638 (1988) is similar. InCollins v. Wilcox, Inc., 600 N.Y.S.2d 884 (1992) the plaintiff sued for intentional infliction of emotional distress. The defendant moved for summary judgment claiming the conduct alleged was not "sufficiently outrageous or extreme to make a case of intentional infliction of emotional distress," id. Page 885. The court said the matter was for the jury but only after reviewing the evidence and noting that sexual harassment can give rise to such a claim and that the conduct was not confined to one instance but represented a pattern of behavior. The court said one instance of such behavior "is probably not actionable," is p. 886. The court also noted the behavior alleged went beyond being merely "annoying" because the "courting" activities were directed at a married woman. It was only after such review that the court held that whether the conduct was sufficiently outrageous was for the jury. In Richard L. v. Armon, 536 N.Y.S.2d 1014, 1017 (1989), a defendant pled guilty to a sexual abuse charge against an infant. A suit was brought in her behalf based on this tort and the plaintiff moved for partial summary judgment. The court denied the plaintiff's motion and said: "While it is properly for the court to determine, as a question of law, whether the alleged misconduct of the defendant Richard Armon may reasonably be considered so extreme as to permit recovery, so as to permit submission of the issue to the jury in the first instance . . ., it is not for the court completely to usurp the function of the jury and to decide itself that his conduct is in fact so extreme." Of course, the New York courts in appropriate circumstances will grant a motion to dismiss and a fortiori a motion for summary judgment when the conduct of the defendant was "as a matter of law, simply not `outrageous' enough to support" a claim for intentional infliction of emotional distress. Novak, etal. v. Rubin, 514 N.Y.S.2d 523, 524 (1987).
The conduct alleged here simply does not rise to that threshold level to allow it to be considered a jury question and as a matter of law cannot be considered sufficiently outrageous and extreme.
This plaintiff, if her uncontradicted statements on this point are accepted which the court does for the purposes of this motion, was subjected to unacceptable harassment, threats and CT Page 5370-ZZ profanity by a car dealer who threatened to have her car repossessed the same day by the police. At the time, she was undergoing severe upset in her life regarding her stepfather's death. She reacted to the threats by having a document prepared that she admits was falsely prepared. She knew the document as to her wages could only be prepared by a specific department of the defendant company and, knowing that, apart from whether the contents of the document were true, she manufactured the document herself which she sent to the car dealer. She had a fellow employee type the document and another employee sign it who misrepresented her position with the company.
The same day she, along with the employee signing the document, were fired. The incident may not have "prejudiced" the defendant company in a monetary sense, but it is not even arguable that for a company to discipline or terminate even a longstanding employee for such activity does not violate commonly accepted standards of human decency. Also, the defendant's agents who fired the plaintiff can certainly be held to be aware that the plaintiff was a longstanding employee, but there is nothing that has been offered to indicate they knew the personal problems of the plaintiff regarding her stepfather or even the harassing nature of the calls from the car dealer. The plaintiff alleges that during the meeting where she was informed of her termination the company official who did so was nasty, unpleasant and did not allow her to explain why she did what she was accused of doing. But it was by her own account a short meeting. No allegation is made that profanity was used or that words or actions specifically designed to humiliate or embarrass the plaintiff were used. Only two or three company officials were present at the otherwise private meeting. The two employees were not informed of their termination at the same time. The meeting was held in a building separate from the plaintiff's ordinary workplace and she was not paraded out of her workplace in front of fellow employees or forced to retrieve her belongings in their presence prior to her forced departure from company premises.
As noted, the termination process was very limited as to duration or the occurrence of any events which might run the rusk of causing distress to the plaintiff.
The plaintiff seeks to diminish the force of these observations claiming that in the past similar actions by observation employees did not lead to discipline or termination. However, in her deposition, her testimony is vague and CT Page 5370-AAA unsupported by anything other than hearsay. The plaintiff can't say convincingly that the conduct she refers to was similar to her own. Even if this were true, however, and the company or its officials first became aware of this practice or decided to move against it with her, how could it be said to be extreme and outrageous conduct to discipline an employee for admittedly sending out a false document?
The court does agree with the plaintiff that if she was terminated because of her race or if others equally at fault were not terminated because of the fact that they were of a different race or the participants to these events were treated in any way differently because of their race, this would, without more, constitute a prima facie claim of extreme and outrageous conduct. Such conduct cannot be tolerated by a society that purports to regard itself as civilized. But the races of the other direct participants in this affair have not been supplied to the court. The individual who signed the letter was fired along with the plaintiff and her race is unknown to the court. Even if the court assumes the secretary who typed the letter was Caucasian, the people fired had more important positions who would normally direct a secretary what to do and the plaintiff had a job where she supervised over a dozen people. Also, the mere allegation of different treatment because of race without anything more will not bar the granting of this motion. There may exist non-discriminatory reasons why this person was not fired. Confined, as I must be, to the record, the court cannot even determine whether or not the individual typing the letter was herself disciplined in some way.
Also, even if the plaintiff were to prevail on her breach of contract claim and the termination violated her justified expectations as to progressive discipline, this would not elevate the matter to a prima facie claim of outrageous and extreme conduct. If that were to be the law, every termination case based on a violation of contract rights would be wedded to a claim of intentional infliction of emotional distress. There has to be something more — to wit: outrageous and extreme conduct. That simply has not been alleged sufficiently here and the cases cited by the plaintiff do not present factual allegations similar to the ones made here. The plaintiff cites cases for example where an employee was physically assaulted and threatened, where a husband falsely told his wife he had AIDS, where work assignments were given in disregard of an employee's known fear of heights, where a supervisor taunted an employee over his alcohol problem, where a person was fired because of protected union activities, CT Page 5370-BBB where a claimant was subjected to surveillance by an insurance company, see Berry v. Loiseau, supra; Brown v. Ellis,40 Conn. Sup. 165 (1984); Mellaly v. Eastman Kodak Co., 42 Conn. Sup. 17
(1991); Whelan v. Whelan, 41 Conn. Sup. 519 (1991); Rosten v.Arart Wise, Inc., 7 CSCR 1147 (1992); CNB v. Montanari,9 CSCR 196 (1994). The court will not cite all the cases referred to but they are, like the cases just cited, different in kind from the case now before the court. Here there was admitted wrongdoing by the plaintiff and it cannot be said the defendant's response was extreme or outrageous based on anything presented to the court.
Summary judgment is granted in the defendant's behalf as to the intentional infliction of emotional distress count and denied as to the breach of contract claim.
Corradino, J.