[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION AFTER TRIAL ON THE MERITS
The above-captioned case arises from a two-page written contract. By the terms of that contract the plaintiff, a manufacturer of recycled paperboard, agreed to sell and one of the defendants, The Standard Group, Inc., agreed to purchase recycled paperboard for conversion into printed boxes and cartons as packaging for various products. The plaintiff, Simkins Industries, Inc. ("Simkins"), claims that the defendant breached the contract in various ways, including terminating its purchases of CT Page 7214 material before the end of the contract term, failing to buy the quantity agreed to, and failing to pay for all product received. The defendants are Standard Folding Cartons, Inc, ("Folding Cartons"), which is located in Jackson Heights, New York; Southern Standard Cartons, Inc. ("Southern"), which is located in Louisville, Kentucky; and The Standard Group, Inc. ("Standard"), a holding company, which executed the contract at issue.
The defendants have pleaded in special defenses that they paid for all goods and that termination of the contract was justified because the paperboard provided failed to meet their requirements and was not of merchantable quality. The defendants filed a counterclaim alleging that Simkins breached the contract by failing to provide paperboard of the quality promised and that it failed to correct problems with the paperboard. The defendants seek damages for additional costs caused by the alleged breach. The plaintiff filed a special defense to the counterclaim asserting that the doctrine of accord and satisfaction applied.
On April 26, 2002, during the second week of the trial, the defendants withdrew the second count of their counterclaim, in which they had alleged that the plaintiff tortiously interfered with the defendants' business expectancies by refusing to sell the defendants a specialty paperboard needed to fill that customer's order.
Procedural History
This action was commenced in the Superior Court for the Judicial District of New Haven and was transferred to the complex litigation docket for management and trial. At a case management conference conducted on June 14, 2001, this court elicited from counsel their choice of trial dates and their preferences for deadlines for disclosure of expert witnesses. The dates chosen by counsel were adopted by the court and issued in Case Management Order #1. That order included a provision requiring the plaintiff to disclose experts in support of its claims and the defendant to disclose experts in support of its counterclaims ("claim experts") by November 1, 2001. The order also required the parties to disclose experts in defense to the claims of the opponent ("defense experts") by January 15, 2002. The order specified that disclosures comport with the requirements of Practice Book § 13-4(4). Trial was scheduled to begin on April 16, 2002.
During the period from November 2001 through January 2002, the parties requested various extensions of the deadlines for disclosing experts. The parties litigated these and other discovery issues with great attention to advantages to be realized and disadvantages to be imposed on their adversaries, and with considerable concern that extensions of time might CT Page 7215 make depositions of experts impossible or highly inconvenient in the weeks during which counsel wished to be preparing for trial rather than completing discovery. The court extended the deadline for disclosure of "claim experts" that is, experts whose testimony would support the party's own claim, or in the case of the defendants, their counterclaims, to February 1, 2002, and of "defense experts" to March 1, 2002.
In a pleading decided on March 1, 2002, the parties requested that the court approve a detailed agreement to extend the time for disclosing defense experts until March 10, 2002, provided that all documents on which the expert's opinion was based were provided to opposing counsel by that date. The parties proposed that if Ben Markens was disclosed as a defense expert, he must be disclosed in accordance with Practice Book § 13-4 by March 6, 2002. The defendants timely disclosed Markens as an expert witness in support of their claim that Folding Cartons suffered lost profits; however, they did not disclose him as an expert on the subject of Southern's lost profits until April 16, 2002. The court granted a motion to preclude his testimony as an expert on the issue of lost profits suffered by Southern, and he testified on the other subjects for which he had been timely disclosed.
The court also granted a motion in limine concerning the scope of the testimony of Philip Lieder on the issue of industry standards concerning incidence of quality problems, as he was not timely disclosed as an expert on this subject.
Trial to the court proceeded with twelve days of testimony followed by oral argument. The parties submitted pretrial briefs, and the court set May 13, 2002, as the deadline for post-trial briefs. At the request of counsel, the court extended this deadline to May 17, 2002.
This case posed unusually difficult issues in determining what the facts actually were. Most witnesses were employees of the plaintiff or the defendant. The parties handled most transactions orally, with minimal documentation. Both sides padded their pleadings and pre-trial briefs with claims from which they retreated in the course of trial. Both the plaintiff and the defendants operate fast-paced, high-volume businesses with an emphasis on getting jobs done rather than on documentation. Many of the actions of the parties are amenable to more than one interpretation. In deciding the central issues, the court has had to depend heavily on its assessment of the credibility of the various witnesses.
Findings of fact
Simkins operates three mills that produce recycled paperboard and seven CT Page 7216 businesses that convert this product into folding cartons. As well as supplying its own converters, Simkins sells paper products from its mills to other converters.
Recycled paperboard is made from old newspapers and other previously used paper products, referred to as "stock." The Simkins mills pulp these materials and form them into multi-ply paperboard on long paper-making machines that extract water from the pulp and join the layers into paperboard of various grades or thicknesses for various uses. They refer to these grades as "calipers." The mills apply coatings of clay to the front and back of the paperboard. The white clay coating on the front provides a smooth surface for printing. Simkins forms its recycled paperboard into paper that is ninety-two inches wide, then slits an inch off each side and a further slits along the span to form rolls of the widths specified by customers.
Because recycled paperboard is made of recycled materials, some imperfections in the surface are regarded as usual and within the realm of commercially acceptable quality for this product.
The three Simkins paper mills sell some of their output to their own converter divisions and some to outside converters such as the defendants. One of Simkins' paper mills is located in New Haven, Connecticut; another, the Lowe Mill, is located in Ridgefield, New Jersey; and a third, located in Baltimore, is not at issue in this case. Simkins' Lowe Mill does not manufacture paperboard in the "heavy" weights. While witnesses varied in their characterization of weights as "heavy," most agreed that paper of a caliper of 24 millimeters or thicker was "heavy weight."
The defendant Folding Cartons is located in Jackson Heights, New York, approximately a twenty-five minute drive from the Lowe Mill. It purchases rolls of paperboard, cuts the rolls into sheets on a machine known as a sheeter, and prints, scores, cuts and folds paperboard to create paper cartons to hold various products, including packaged foods. Generally, Folding Cartons did not mix the orders of various customers but laid out repetitions of the same printings in multiples on its printed sheets in printing on recycled paperboard. At the times at issue, it printed the cartons in a seven-color Mitsubishi press designed to run at high speeds for greater productivity than older presses.
Southern is located in Louisville, Kentucky. It engaged in the same operations as Folding Cartons, however, it printed mixed layouts of cartons from various customers and generally used only four-color printing, using the other three stations in its seven-color Mitsubishi press to apply sizing and other coatings instead of colored printing ink. CT Page 7217 Both Folding Cartons and Southern used grades of new paperboard as well as board made from recycled paper. The former variety of paperboard is known as "virgin" board, a category that includes both bleached and unbleached versions, referred to by the witnesses and in the exhibits as "SBS" and "SUS."
Though many paper mills produce recycled paperboard of the same weights, there are differences in the product significant enough that the equipment of some converters is able to process the product of one mill but not the same product from another mill. The ability to convert the board produced by a particular mill can vary depending on the speed of the converter's sheeting and printing processes. Standard had found in previous transactions that the heavier weights produced by the Lowe mill were not strong enough for the cartons ordered by Folding Carton's customers and that the heavier weights produced by Simkins' mill in New Haven had a coating that was too rough to work well in Standard's presses.
The chief executive of both Folding Cartons and Southern is Steven Levkoff, who took over the folding carton businesses from his father. Levkoff bought recycled paperboard from Simkins as well as other suppliers sporadically over a period of at least fifteen years before 1998.
In 1996, Levkoff and Leon Simkins, the plaintiffs chief executive officer, signed a five-year agreement concerning purchase of recycled paperboard. In February 1998, they agreed to replace that agreement with a new contract. Levkoff signed the contract on behalf of Standard Group, Inc. The other two defendants, Southern and Folding Cartons, are not parties to the contract. The terms of the February 1998 contract and the parties' adherence or breach of its terms are the subject of the claims in this suit.
Levkoff and Simkins discussed the terms of the new agreement on several occasions before reaching an oral agreement. They agreed that Simkins would set forth the terms agreed to in a written letter agreement. Without consulting a lawyer either as to the terms or the drafting, Simkins prepared the letter agreement, setting forth the terms to which Levkoff had agreed orally. Levkoff proposed some clarifications to which Simkins agreed, and Levkoff had these provisions typed on to Simkins' version. Both men then executed the letter agreement, initialling each paragraph. That agreement, which is dated February 10, 1998, provides that it "replaces previous arrangements of 5/13/96."
The parties agreed that the effective dates of the February 10, 1998, contract were March 1, 1998, through March 1, 2003, with some fee CT Page 7218 arrangements extending from February 2, 1998. The terms of the agreement at issue in this suit are as follows::
 1. The agreement will be in effect for a period of five (5) years, beginning March 1, 1998 and expiring on March 1, 2003. Recycled rebates commence with shipments of 2/2/98.
 2. Purchase Agreement — Standard purchases approximately 21, 000 tons of recycled paperboard annually with approximately 14, 000 tons being used in Jackson Heights and 7, 000 tons being used in Louisville. Standard agrees that it will purchase 100% of its recycled paperboard requirements at competitive prices (currently $535 per ton for clay coated newsback board) and quality to meet Standard Group's requirements.
 Each quarter, Standard will advise Simkins of any recycled tonnage which was placed with other mills, and the reason for doing so. Standard will cooperate and assist Simkins in their efforts to qualify and meet its customers' specifications. Simkins will issue monthly tonnage statements to Standard.
 This tonnage will be excluded from Standard's obligation to purchase from Simkins, until Simkins' board qualifies, but in any event, Standard agrees it will purchase no less than 15, 000 tons annually (3, 500 tons per quarter) from Simkins.
 Provided that Standard fulfills its purchase obligations, Simkins will rebate $50 per ton in the form of a credit memo, payable quarterly. If tonnage requirements are not met in any quarter, the rebate will be forfeited for that quarter. If in the next quarter the tonnage requirement has been met cumulatively, then the rebate will be paid for both quarters.
3. Simkins and Standard will enter into a joint purchase agreement, combining their purchasing power. A separate trading company will be formed to which any rebates from suppliers will be paid. Each quarter, the rebates will be distributed to Simkins and Standard in proportion to that received for each CT Page 7219 of their purchases. Rebates will commence with shipments of 3/2/98.
 In the event that Standard has not met its minimum purchase commitment under item #2 of 15,000 tons per year (3, 500 tons per quarter), it will forfeit its rebate from the trading company for that quarter. If tonnage requirements are not met in any quarter, but in the next quarter it has been met cumulatively, then the rebate will be paid for both quarters. Such forfeiture does not cancel Standard's purchase obligations.
 After any eight consecutive quarters, in which Standard has met its purchase requirements, the forfeiture of the rebates will no longer apply. If, however, there are two subsequent quarters in which Standard has not met the purchase requirements, then the forfeiture of the rebates would be automatically reinstated.
 4. Standard and Simkins will avail themselves as subcontractors working as partners to absorb any overflow from each company's plants.
 5. If, during the term of this agreement, Standard determines to sell its business, it will give Simkins Industries the right of first refusal to purchase it. If Simkins determines not to purchase Standard's business, and the business is sold to a third party prior to the expiration of this agreement, this agreement will expire at the closing of any such sale, but the purchase agreement portion will be phased out over a six-month period after the closing date.
The arrangement set forth in provision #3 of the contract reflected the fact that Simkins, in buying SBS paper for the converters it owned, was able to obtain a better price because it bought in volume. The joint purchasing arrangement allowed Standard to obtain the same price as Simkins for SBS paper. Simkins' purchases of SUS board were less, and both it and Standard benefitted in combining their tonnage to make joint purchases of SUS from suppliers.
Leon Simkins and Steven Levkoff both testified to the effect that the contract included certain assumptions and exceptions that were not CT Page 7220 explicitly stated in its text. They both assumed that the requirement to "purchase 100% of its recycled paperboard requirements" did not extend to situations in which a customer designated another mill's board, or Simkins was unable to deliver a particular weight of board immediately to meet a rush order, or Simkins' board could not be run efficiently on Standard's equipment. They assumed that every shipment would not be perfect but that Standard would not be obligated to buy board from Simkins if Simkins was experiencing problems in its production that resulted in an unreasonable number of disruptions of Standard's production. The latter understanding was demonstrated by the parties' approach to Simkins' interruption of production to alter its paper-making machinery in late August 1999, an event that will be discussed in more detail below.
Until August 1999, the parties operated under the contract without significant problems. Simkins made no complaint about Standard's level of purchases, and Standard did not complain of the quality of the recycled board provided by Simkins, though it claimed occasional deductions for problems whose frequency and severity were within the range of what both parties regarded as acceptable limits. Standard was the biggest customer of the Lowe mill. Its 15, 000 ton annual purchase constituted approximately thirty percent of Lowe's sales in 1999. Standard operated in a highly competitive industry, and it had invested in a high-speed Mitsubishi press for competitive advantage. In order to keep the press optimally productive, Standard needed to cut the rolls of recycled paperboard into sheets at a rate of 10, 000 sheets per hour. Slowing the sheeter would reduce the number of sheets available to feed into the printing press, and would reduce productivity and profitability. Standard ran its press twenty-four hours a day, six and sometimes seven days a week. The court finds that the provision in the contract that referred to Simkins' obligation to provide "quality to meet Standard Group's requirements" meant that the board supplied must be capable of being used in Standard's plants at full-speed or close to full-speed operation of its equipment.
In August 1999, Simkins notified Standard that it would be installing new formers (equipment that forms the layers or plies of paperboard) at the Lowe mill and suggested that Standard order ahead so that it would have sufficient paper to cover its needs during the time that the paper mill's production stopped for the installation and testing of the new equipment. The installation was delayed and did not actually occur until the last few days of August. From that time to approximately October 15, 1999, the paperboard produced at the Lowe mill had portions that delaminated when run through Standard's high-speed printing press. Because of the size of the rolls of paper and the sporadic occurrence of the defect, Standard experienced some of the delaminations while running CT Page 7221 the presses but discovered other affected areas only when the printed sheets were being folded and glued.
Standard filed complaints for time lost in stopping or slowing its press because of delamination, and it deducted at least $129,000 for delamination problems on board produced between August and mid-October 1999. (Ex. 310.) Lowe allowed the deductions and believed that it had solved the delamination problem by applying starch to bind the layers. It brought a claim against the manufacturer of the formers for losses caused by the delamination problem and settled that claim for goods, equipment and approximately $600,000 in cash.
While the Lowe mill was experiencing the problem with delamination, Standard bought paperboard from other suppliers and Simkins had no objection to that course of action despite the contract's terms requiring "100%" purchases from Simkins. Between September 1999, and February 14, 2000, Standard made frequent complaints about the quality of the paperboard supplied by Simkins. In September and October 1999, most of the complaints related to delamination of the paper, though some related to other problems. After the delaminations problems subsided, however, Standard experienced other problems at the Jackson Heights plant, arising from the paperboard produced by Simkins' rebuilt equipment.
For each complaint, supervisors at Standard called Seymour Haidt, the Lowe mill salesman assigned to the Standard account. If the problem occurred during the day shift, John May, who purchased paper and processed complaints about the paper at Standard's Jackson Heights plant, called Haidt when the problem occurred. If the problem occurred during the night shift, May looked at the press operators reports and the quality control findings and samples when he arrived the next morning and called Haidt. Upon receiving a complaint, Haidt went promptly to Standard's Jackson Heights location to discuss the complaint and pick up samples of the paperboard showing the defect on which the claim was based. Some of the complaints concerned mottling, a condition caused by flaws in the surface of the board; some concerned curl, a condition caused by faulty moisture content; and some concerned dirt, the presence of particles of paper dust or bits of clay that caused the ink to fail to adhere, creating blemishes on the printed product known as "hickies." If hickies were the problem experienced, Standard usually furnished Haidt with both sample sheets showing flawed printing and tape pulls, which demonstrated the particles that had adhered to the inked blanket, causing the hickies. Haidt showed the sample sheets and tape pulls to production personnel at the Lowe Mill and prepared reports of each claim of defect on a form that included the date he had been called about the defect and the date the paperboard at issue had been manufactured by the Lowe mill. (Exs. 481, 485, 487, 490-532, 547, 548A, 549-559.) CT Page 7222
Each time Standard had a quality complaint, May calculated the amount of additional cost that the alleged defect had caused and included that charge in a written complaint. May did not prepare written complaints immediately and sometimes waited several weeks before writing up the complaints, often completing a batch of complaints on the same day and dating them all on that day, though they related to defects identified on various dates. On these complaints, Standard represented that each hour that the press was delayed because of a problem cost $450. Standard referred to these charges as "downtime." On occasion, where Standard reported defects in a roll of board, it returned the remaining rolls or sheets, if it the board had been cut into sheets, from the same order to Simkins and included the cost of returned board in its written complaints.
Standard did not request a credit for claimed defects, rather, it simply deducted the amounts set forth on its claim forms from the amounts set forth in invoices issued to it by Simkins. In addition to the frequent responses by Seymour Haidt to quality problems, Frank DelGrego, Simkins' manufacturing manager, who has an extremely detailed familiarity with paper-making and production equipment and issues, went to Standard's Jackson Height plant on several occasions to discuss the quality problems with Standard personnel.
Simkins honored all of the deductions based on board problems that Standard took and never asked for any additional back-up information or documentation to support the amounts claimed.
Standard was patient about the delamination problems that occurred between late August 1999 and mid-October 1999, and did not threaten to terminate the contract because of this problem; however, Levkoff began to be annoyed by the number of defects the Jackson Heights plant continued to experience and loss of productivity caused by hickies, mottling and other problems in running Simkins' board.
In a letter dated November 8, 1999, Levkoff warned David Whipple, production manager at the Lowe mill, that "the strength of our relationship has proven itself through the past two to three months of problems and we will continue to be supportive — but, David — not for too much longer." (Ex. 307.) This warning from the Lowe Mill's biggest customer led Simkins to tally up the complaints expressed as the number of dollars of deductions/credits taken by Standard for defective stock and other reasons during each fiscal year. As of November 22, 1999, a period of less than two months, since Simkins' fiscal year began on October 1, Whipple calculated that Simkins had received 16 claims, including ten for delamination and five for dirty stock. Don Young, who CT Page 7223 attended a meeting on November 29, 1999, at which Levkoff and Whipple discussed the recent problems, wrote a memo to Leon Simkins reporting on the problem. In a November 30, 1999 interoffice memorandum, Young reported to Leon Simkins that he had begun asking Simkins' own converting plants if they were continuing to have problems with the board produced by the Lowe mill. Young stated that the first plant to report was the Harvard mill, a division of Simkins Industries which, like Standard, used a high speed printing press. Young wrote:
 The first report just came to me from Harvard (see attached). There can be no doubt that unless Lowe initiates process controls and shapes up complaints will continue. Based on Harvard's evaluation and Standard's complaints, I have to believe some of Lowe's other customers that produce high-quality folding cartons on high-speed equipment are experiencing similar problems. After the money you just invested at Lowe, I'm sure this is very frustrating to you. The problem is either equipment, personnel, or a combination of both.
Immediate action in some form must be taken — status quo is unacceptable. (Ex. 310.) The plaintiffs' witnesses testified that they have not been able to locate the report on quality problems from the Harvard mill.
Simkins has taken the position that Standard's complaints were either inflated or fictive. It has taken the alternative view that even if the complaints accurately reflected problems in running paperboard produced at the Lowe mill, the reason for the problem was that Standard's sheeter blade was creating "knife chop" that spread dirt on to the paperboard. The court finds highly significant and highly damaging to Simkins' version of the facts Simkins' representation that it is unable to locate the report from its Harvard converting mill specifying the problems it was experiencing with Lowe mill paperboard during the fall of 1999. That report was relied upon by Young in investigating the problems that followed the rebuild at Lowe mill, and it is very likely that a copy of the report was in the possession of the Harvard operation, a Simkins division, even if it really was mislaid at the Lowe mill. The court also finds Simkins' failure to retain the tape pulls and samples of defective board very damaging to its explanations of the situation, especially since it knew that Levkoff was lodging frequent claims and had issued an ultimatum that could lead to termination of the contract. The implication of Young's report is that Harvard, which, like Standard, ran board on high-speed equipment, was having the same problems with the board produced after the rebuild of the Lowe mill, and that those problems were CT Page 7224 not confined to delamination.
On November 29, 1999, when he met with Young and Whipple, Levkoff, despite his warning letter of November 8, 1999, expressed the hope that the situation would improve, but later the same afternoon the Jackson Heights plant reported that the board surface on board just delivered from the Lowe mill had caused mottling and that several loads "presented hickey problems." (Ex. 310.) Contrary to Simkins' view that Levkoff was inflating claims of defects as a pretext for terminating the contract, Levkoff continued to express hope that Simkins could supply useable board and resolve its quality problems. John May did not submit claims for every instance of delay or problems caused by board produced by Simkins and ruled that no complaint should be filed for those defects reported by press operators or quality control inspectors that resulted in only brief downtime.
Simkins' own analysis of complaints by Standard confirms that the number of problems with quality was much greater in the fall of 1999 than it had been in the past. For fiscal year 1998, that is, from the time the contract period began in February 1998 through September 1998, Simkins determined that it had issued twelve credits, one relating to a special board not reflective of its general supply to Standard. From October 1, 1998 through September 30, 1999, Simkins issued fifteen credits relating to its general supply to Standard. The sixteen claims from October 1, 1999, through November 22, 1999, thus represented a significantly greater incidence of quality problems. Those problems continued in November and December 1999 and January 2000. Documentation and testimony that relates to Standard's claims for this period, not including the sixteen claims reflected in Young's tally, demonstrate problems with stock that curled, lacked sufficient body to run smoothly in the press. Other problems included occasional delamination, mottling, and the presence of debris that caused hickies. The court finds that Standard experienced sixteen additional instances of defective board in this period for which it took deductions, and four more (Exs. 133, 134, 155 and 156) for which Standard did not take deductions.
The court finds that the quality problems experienced at Standard's Louisville, Kentucky, plant were few and were within the range that was customarily experienced in processing recycled paperboard. The problems experienced at the Jackson Heights plant, however, were in excess of what was normal. The effect of some of the defects was to cause Standard to lose press time and to increase the risk of sending defective products to customers. While Standard did not actually lose customers, it experienced delays that imperiled its ability to meet delivery dates, and the anxiety and pressure that accompany such interruptions in smooth completion of orders. CT Page 7225
Standard has suggested that the greater reports of problems at Jackson Heights than at the Louisville plant reflect Levkoff's presence at the former plant and a plan by him to create the appearance of excessive problems to support termination of the contract. The facts do not support this theory. Levkoff forgave the first several weeks of delamination problems, agreed to order product ahead of time to cover Simkins' rebuild shutdown, and continued to express hope that performance would improve. John May, who described the process he used to verify and quantify complaints, impressed the court as a very forthright, truthful witness who not only did not fabricate complaints but decided not to submit at least four complaints at a time when the plaintiff argues that Standard was behaving in an ultra-sensitive way to quality issues in order to build a case for terminating the contract. Differences in the operation of the two plants also explain why Jackson Heights had more problems. The Louisville plant ran only four colors in printing, and its press had empty cylinders that it could use to coat the board with sizing to reduce the impact of debris. All cylinders on the Jackson Heights press were needed for ink application.
Simkins has also suggested that the cause of dirt and hickies was not its operations but Standard's, specifically, that the dirt on the board was created by a ragged cut by Standard's high speed sheeter. The court finds that Standard used the same kind of sheeter blade from September 1999, through December 2000, that it had used during prior periods. In the summer of 1999, Standard had experimented with a sheeter blade recommended by Frank DelGrego, finding that it gave substantially the same results at greater cost. The court notes that DelGrego, who urged the rebuild of Simkins' equipment, has reason to be particularly eager to blame later problems on causes other than changes to Simkins' product's ability to perform in high-speed sheeters and presses thereafter.
In mid-January 2000, Standard began discussing a contract with a new supplier, Smurfit-Stone Container Corporation ("Smurfit"), from which it had continued to buy paperboard occasionally while it was a customer of Simkins. Standard signed a contract with Smurfit-Stone dated February 21, 2000. The price and rebate were the same as with Simkins, and Standard likewise obligated itself to buy a minimum of 3, 500 tons per quarter in order to receive the rebate. The Smurfit contract did not require Standard to puchase all its board from Smurfit if Smurfit could supply useable board, nor did it give Smurfit a right of first refusal in case of the sale of Standard's plants.
After it began using Smurfit's board, Standard experienced some quality problems, but the nature of the problem was the inability of the Smurfit board to be scored for folding into boxes. Problems with dirt and hickies CT Page 7226 were minor and were only within the customary low frequency experienced in the industry. (Ex. 546A.)
Additional findings of fact are set forth in the following discussions of specific claims.
Termination of the contract
Simkins alleges that Standard breached the five-year contract by ceasing to buy its paperboard from Simkins in February 2000, three years before the contract was due to expire. Standard has alleged as its second special defense that "[t]he defendants were justified in terminating the Letter Agreement due to the plaintiffs failure to provide the defendants with paperboard which met the Standard Group's requirements as specified in the Letter Agreement."
A. Burden of proof
Standard argues that Simkins has the burden of proving that it was able to supply paperboard throughout the contract term of a quality that met Standard's requirements, because a party that has not fulfilled its own obligations under the contract may not recover for the other party's breach. Standard cites, inter alia, Dubose v. Carabetta, 161 Conn. 254
(1971); and Citizens Association v. Bridgeport, 84 Conn. 383 (1911).
Simkins responds that Standard has assumed the burden of proof by pleading unacceptable quality as a special defense to the claim of breach. Under Connecticut practice, when a defendant pleads a special defense, the burden of proof on the allegations contained therein is on the defendant. DuBose v. Carabetta, supra, 161 Conn. 262. The Supreme Court ruled in that case, however, that an exception to that rule applies to suits for breach of an insurance contract or construction contract for the sake of "avoidance of pleading and proving at length the performance of manifold conditions as to which there will probably be no issue." Id. In such cases, the plaintiff bears the burden of proving compliance with the condition invoked by the defendant in its special defense. Where this exception does not apply, the burden remains on the plaintiff to prove that he performed in the respects identified in the special defense. Id. The burden-shifting in DuBose v. Carabetta, supra, 161 Conn. 254, has not been extended to contract suits in general.
The Connecticut Supreme Court has continued to rule that:
[a] party may properly be assigned the burden of proving the facts that he affirmatively asserts to be true. Coogan v. Lynch, 88 Conn. 114, 116 . . . CT Page 7227 (1914). A party who pleads a special defense "`presumably does so with the idea of making his defense appear to be stronger and more aggressive, and invites the court to charge that he has assumed the affirmative upon that particular issue.' Coogan v. Lynch, supra." Rix v. Stone, 115 Conn. 658, 664 . . . (1932).
Atlantic Richfield Co. v. Canaan Oil Co., 202 Conn. 234, 237, overruled on other grounds, Santopietro v. City of New Haven, 239 Conn. 207, 212,213 n. 8 (1987).
On those occasions in which the Uniform Commercial Code allocates the burden of proof of proof, moreover, it imposes the burden of proving noncompliance on the party that claims it. See Conn. Gen. Stat. §42a-2-607 (4).
Accordingly, Standard has the burden of proving that it was justified in terminating the agreement.
B. Merits of the claim of breach
Simkins claims that it is entitled to lost profits for the amount of paperboard that Standard would have bought from it for the full term of the contract because Standard was not justified in terminating the contract. Simkins asserts that this claim of breach must be adjudicated both by reference to the provisions of the contract and by reference to those sections of the Uniform Commercial Code that apply generally to construction of commercial contracts for the sale of goods and specifically to requirements contracts.
The relationship between the provisions of the Uniform Commercial Code and the common law of contract with regard to contracts for goods is stated at Conn. Gen. Stat. § 42a-1-102, which provides in pertinent part as follows:
 (3) The effect of provisions of this title may be varied by agreement, except as otherwise provided in this title and except that the obligations of good faith, diligence, reasonableness and care prescribed by this title may not be disclaimed by agreement, but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable.
CT Page 7228
The UCC defines "agreement" at § 42a-1-201 (3) as "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in sections 42a-1-205 and 42a-2-208. Whether an agreement has legal consequences is determined by the provisions of this title, if applicable; otherwise by the law of contracts." The UCC defines "contract" at § 42a-1-201 (11) as "the total legal obligation which results from the parties' agreement as affected by this title and any other applicable rules of law."
The contract at issue is what is commonly called an installment contract, that is, a contract by which the buyer agrees to buy a commodity from the seller in installments as needed. The common law principles that apply to the contract at issue and the UCC's provisions with regard to installment contracts do not lead to different results in the instant case.
The contract provided by its terms that Standard's obligation to buy board from Simkins applied only if Simkins charged competitive prices and supplied board of a "quality to meet Standard Group's requirements." It is a well-established principle of contract law that "[a] contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction." (Internal quotation marks omitted.) Tallmadge Bros., Inc. v. Iroquois GasTransmission System, 252 Conn. 479, 498 (2000), quoting Lawson v.Whitey's Frame Shop, 241 Conn. 678, 686 (1997).
The determination whether the product supplied met Standard's requirements consistently enough to constitute compliance by Simkins with its obligations under the contract was not a matter governed by some undefined subjective assessment by Standard, rather the phrase must be construed in accordance with generally applicable principles governing the construction of contracts. The Restatement of the Law of Contracts (Second) § 228 (1981) provides:
 When it is a condition of an obligor's duty that he be satisfied with respect to the obligee's performance or with respect to something else, and it is practicable to determine whether a reasonable person in the position of the obligor would be satisfied, an interpretation is preferred under which the condition occurs if such a reasonable person in the position of the obligor would be satisfied.
CT Page 7229 Connecticut courts recognize that parties to a contract have a duty to act in good faith and to deal fairly with the other party to a contract.Gupta v. New Britain General Hospital, 239 Conn. 574, 598 (1996); Warnerv. Konover, 210 Conn. 150, 155 (1989). This duty requires that "neither party do anything that will injure the right of the other to receive the benefits of the agreement." Gupta v. New Britain General Hospital, supra, 239 Conn. 598; Habetz v. Condon, 224 Conn. 231, 238 (1992). The standard for determining in good faith whether the product supplied by Simkins met Standards' requirements with sufficient consistency is not set forth in the contract, and the court therefore looks to the UCC for a standard. Section 42a-2-311 (1) states a standard that applies where a contract leaves some terms unspecific:
 an agreement for sale which is otherwise sufficiently definite to be a contract is not made invalid by the fact that it leaves particulars of performance to be specified by one of the parties.
 Any such specification must be made in good faith and within limits set by commercial reasonableness.
Though the contract does not state explicitly what Standard's requirements are, the evidence of what was commercially reasonable in this context is supplied by testimony concerning custom and usage and the course of dealing between the parties. Seymour Haidt and Don Young, who investigated Standard's complaints for Simkins, were concerned about the frequency of complaints, which they clearly did not regard as commercially reasonable. Comparisons of the frequency of problems encountered by Standard in running Simkins' product after September 1999 and running the product of other mills likewise indicates that the level of diminished production was not commercially reasonable. Standard's requirements reasonably included the ability to use the product at a normal speed of operation, with no more than the number of production problems caused by imperfections in the board than was normal in the recycled board box converting industry. The contract did not require Standard to continue to make allowances for Simkins' problems, to slow its production down to a speed at which Simkins' board would not delaminate or show evidence of dirt and hickies, or accept frequent stoppages of the press or frequent inspection of the printed material to discover and pull out sheets affected by dirt and hickies or other defects.
This Court agrees with Simkins that because the contract at issue fits the UCC's description of an installment contract, the applicable sections of the UCC are not those concerning rejection of a single delivery of nonconforming goods but rather the provisions that set standards for CT Page 7230 contracts in which a seller supplies multiple deliveries of goods. The provisions governing this type of transaction provide, at § 42a-2-612
(3) that "[w]henever nonconformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole . . ."
The official comment to § 42a-2-612 (3) notes that
 Substantial impairment of the value of an installment can turn not only on the quality of the goods but also on such factors as time, quantity, assortment, and the like. It must be judged in terms of the normal or specifically known purposes of the contract.
§ 42a-2-612, Comment 4.
The Supreme Court ruled in Cherwell-Ralli, Inc. v. Rytman Grain Co.,180 Conn. 714, 717 (1980), that "[w]hat constitutes impairment of the value of the whole contract is a question of fact."
In contracting for a five-year supply of paperboard of "quality to meet Standard Group's requirements," Standard cannot be understood to have been contracting for paperboard that would present greater production problems, downtime, and lost productivity than board produced in the recycled paperboard industry generally. The substantial value of the contract was for a steady supply at competitive prices of paperboard that would meet industry standards, with only the usual incidence of problems in production of paper boxes.
The evidence presented leads this court to conclude that the problems Standard encountered in using Simkins' paperboard between the end of August 1999 and February 2000 were so frequent that they substantially impaired the value of the whole contract and Standard was justified in terminating the contract.
Simkins has urged that if the problems were viewed on a per-ton basis or by comparing the cost of deductions to the overall billings for the paperboard, the defects should not be seen as excessive. Both of these approaches focus primarily on the impact on the seller of the product and not, as is appropriate, on the impact on the buyer viewed in the light of impairment of the value of the contract. While Simkins may have lost relatively little by supplying paperboard that caused problems in Standard's press and that required close scrutiny by Standard's quality control, Standard experienced disruption to its production that endangered its ability to meet delivery deadlines. Brian Gorman, Standard's vice-president of sales, testified that Standard ran on tight CT Page 7231 schedules, that he was called in with increasing frequency because deliveries were being jeopardized by delays in production, and that he received verbal complaints from customers over quality issues. John May testified that after September 1999, the volume of problems was out of the ordinary and beyond what is expected in the industry. Simkins' own investigation reports confirm frequent problems. (Exs. 481, 485, 487 and 495-532.) Though Standard was compensated by Simkins for the actual costs of having to clean the press blankets to remove dirt, to stop the press to remove delaminated board, or to cull defective board from its inventory, such compensation did not reduce the pressure of filling orders on schedule after such problems were addressed. Simkins has observed Standard did not actually lose any customers; however, Standard did not have a duty to experience extreme or dire harm before terminating the contract.
The value of the Simkins contract to Standard was to have a certain, steady supply of paperboard that it could use with its equipment at optimal speed to meet its production needs. After August 1999, Simkins was instead supplying board with an unusual number of problems that reduced productivity and imposed burdens on Standard's quality control functions to avoid delivering faulty products to its own customers. As the Connecticut Supreme Court observed in Cherwell-Ralli, Inc. v. RytmanGrain Co., supra, 180 Conn. 714, egregious conduct by a party may justify immediate termination, but lesser problems may require a party to temporize to ascertain whether the other party will perform in the future. Id., 718. Standard conferred with Simkins and put up with the frequent problems for several months, but it did not receive any reliable assurance that the quality problems that began with the installation of the new formers would be solved.
Simkins has suggested that Standard's reports of recurrent quality problems were part of a plan by Levkoff to avoid the contract and obtain paperboard on more favorable terms. Simkins suggests Levkoff s motivation was the elimination of the right of first refusal. Another company had in fact explored purchasing Standard in June 1999. If Levkoff were indeed anxious to sell without the burden of permitting exercise of a right of first refusal, he would hardly have been so cooperative with the delamination problems experienced by Simkins, and could have been expected to have terminated the contract as soon as the delaminations offered him the opportunity. Likewise, if the quality complaints had been exaggerated in order to justify termination, Southern Standard would have been making more complaints as well, and John May would not have been foregoing monetary claims for some of the quality problems encountered. Simkins was supplied with tape pulls and samples to prove each complaint. Simkins did not negate Standard's proof, and its own internal documents confirm the problems. (Exs. 310 and 312.) The court finds that CT Page 7232 Standard's quality complaints were not pretextual, and that Standard tried to work with Simkins to resolve problems but had no duty to do so indefinitely.
Simkins argues that Standard's termination of the contract was not justified because, in Simkins' view, the dirt and hickie problems that Standard experienced after Simkins altered its formers were caused by Standard's own sheeter. Seymour Haidt advised Standard to run the sheeter more slowly after September 1999, with the view that the paperboard would not create dirt when sheeted at lower speeds. The speed of Standard's sheeter determined the speed at which sheets could be processed in the printing press and, therefore, the overall productivity of the Jackson Heights converting operation. The board that Simkins supplied to Standard before it changed its mill operation was capable of being sheeted at Standard's normal production speed without creating frequent dirt and hickie problems. Though no witness was able to explain convincingly why the board produced after that date resulted in frequent dirt and hickies, Simkins' obligation was to supply product that met Standard's high speed requirements, and it failed to do so after it changed its own production equipment.
The court finds that under the legal principles advanced by Simkins and described above, Simkins breached its obligations under the contract by failing to supply board that met Standard's requirements, that the breach substantially impaired the value of the whole contract to Standard, and that Standard's refusal to buy board from Simkins after February 14, 2000, did not constitute a breach of Standard's obligations under the contract.
Failure to pay for goods supplied
Simkins claims that Standard has failed to pay for all of the paperboard supplied to it for which payment is due. In its pretrial memorandum, Simkins represented that "Standard still owes Simkins approximately $509,000 for recycled paperboard that Simkins delivered to Standard before it terminated the Letter Agreement." (Brief, April 15, 2002, p. 7.) At trial, Leon Simkins stated that thirteen items amounting to $240,088.42 that had been included in the $509,996.83 claimed were no longer claimed as damages by the plaintiff, and that the plaintiff was claiming $269,908.41. (See Ex. 184.) The court finds that other amounts that Simkins has included in its calculation constitute unjustified attempts to recoup rebates provided under the terms of the contract.
Levkoff acknowledged that after taking all rebates justified by the terms of the contract, the Standard Group, Inc. has failed to pay the plaintiff $50,211.99 for board that it received that was not claimed to be CT Page 7233 defective. The court finds that Standard owes Simkins $25,954.52 for paperboard supplied to Southern Standard Cartons in Louisville and $34,892.41 for board supplied to Standard Folding Cartons in Jackson Heights. This sum includes the $9,822.00 that Standard failed to pay when price changes occurred while orders were in process. Standard had been applying new prices to pending orders when an industry price change favored Standard and old prices when those prices favored Standard. The contract did not entitle Standard to select different price applicability dates for each order, and Simkins has proven that it is entitled to $9,822.00 under a uniform approach to the application of price changes. Simkins had agreed to drop this claim if Standard continued to order board from Simkins. Standard instead terminated the contract, and Simkins is not therefore bound by its offer of compromise on this issue. The court's calculation of unpaid amounts due excludes two charges for $2,833.34 each that Leon Simkins unilaterally imposed after he decided that Standard should pay part of compensation of Don Young for his services in purchasing SBS and SUS paperboard for both parties. (See Exs. 210 and 211.) The contract does not provide for such a payment and the defendants never agreed to it.
The court finds that the Standard Group, Inc. breached the contract by failing to pay for all non-defective paperboard it accepted from Simkins, and that the amount due the plaintiff is $60,846.93
The only reason Standard gave for its failure to pay the $50,211.99 it has admitted was due was the pendency of this litigation. That amount was a liquidated sum about which no dispute existed, and this court finds that an award of prejudgment interest is warranted under the standard stated in Maloney v. PCRE, LLC, 68 Conn. App. 727, 754-55 (2002). Pursuant to Conn. Gen. Stat. § 37-3a, Simkins claims interest at the rate often percent for the detention of this sum after it became payable. The parties did not present the court with the evidence of actual interest rates in effect from February 14, 2000, to date, and the court exercises its discretion to apply the statutory rate allowed in §37-3a. The interest due to date is $11,569.30.
Breach of quantity requirements
The contract required Standard to buy all of its paperboard from Simkins for the term of the contract, "at quality to meet Standard's requirements." In discovery, Standard disclosed the amounts of paperboard it bought from other suppliers between February 1998 and February 14, 2000, the date when it terminated the contract. Many of the purchases reflected in the summary are for paperboard at weights of 26 point or heavier. The parties agree that Simkins was not able to produce some of the heavy weights of paperboard used by Standard because Simkins' product CT Page 7234 at these weights could not be processed successfully in Standard's equipment.
Simkins was, however, able to produce paperboard at weights lighter than 24 caliper, yet Standard bought board at these weights from other vendors, despite its clear obligation to buy from Simkins.
The evidence suggests that Levkoff never had any intention of complying with this portion of the agreement. He told John May, who handled purchasing, only that he needed to buy 15, 000 tons per year, or 3, 500 tons per quarter from Simkins, the quantity necessary to obtain the $50 per ton rebate. He did not tell May of the obligation to purchase additional tonnage, and May testified that he understood only that he was to buy "the majority" of the paper for the Jackson Heights plant from Simkins.
On one occasion in June 1998, Levkoff reported Standard's purchases of board from other vendors. (Ex. 304.) He then stopped making such written reports. The court did not find credible his explanation that John Hughes, who left Simkins in November 1998, told Levkoff that he need not report such purchases. Hughes joined Rock Ten, a competitor of Simkins, and Levkoff, who socialized with Hughes, ordered board from Hughes after Hughes joined Rock Ten. Levkoff testified that despite the provisions of the contract with Simkins, he regarded himself as free to order paperboard from other paper mills even if Simkins could supply it, because Levkoff wished to keep up relationships with other mills through occasional orders. The court finds that Levkoff did not view the requirement to buy "100%" of its board from Simkins (except for certain situations noted on pages 8-9) as an obligation that he had to fulfill. The forfeiture of the rebate was not tied to this provision but only to the provision setting the 15, 000 ton minimum, and it appears to the court that Levkoff concluded that so long as he met the 15, 000 tons minimum Simkins was unlikely to inquire about outside purchases because Standard was such a big customer. of the purchases from other vendors listed on Exhibit 12, the court finds that the following are for non-heavyweight recycled paperboard that the contract obligated Standard to buy from Simkins:
6/10/98 70.5 tons 6/23/98 18 tons 6/23/98 56 tons 6/25/98 9 tons 7/1/98 56 tons 7/6/98 35 tons 7/10/98 80 tons 7/13/98 47.5 tons CT Page 7235 7/15/98 9 tons 7/16/98 56 tons 7/16/98 56 tons 7/16/98 34 tons 7/22/98 18 tons 7/23/98 56 tons 8/19/98 18 tons 8/19/98 57.5 tons 8/19/98 57.5 tons 8/20/98 56 tons 8/20/98 56 tons 9/14/98 17.5 tons 9/16/98 9 tons 9/23/98 18 tons 9/24/98 62.5 tons 10/7/98 56 tons 10/8/98 56 tons 10/26/98 17 tons 11/3/98 32 tons 11/9/98 57.5 tons 11/20/98 56 tons 12/17/98 55 tons 12/18/98 80 tons 1/14/99 55 tons 1/19/99 56 tons 1/26/99 17 tons 2/9/99 55 tons 2/11/99 17 tons 2/11/99 55 tons 2/12/99 17 tons 2/12/99 64 tons 2/16/99 8.5 tons 2/16/99 33 tons 2/18/99 33.5 tons 2/18/99 55 tons 2/19/99 74 tons 2/23/99 17 tons 3/1/99 9 tons 3/10/99 55 tons 3/10/99 17 tons 3/11/99 33 tons 3/15/99 17 tons 3/30/99 9 tons 3/31/99 55 tons 4/7/99 9 tons 4/7/99 9 tons CT Page 7236 4/8/99 17 tons 4/20/99 9 tons 4/23/99 17 tons 4/26/99 28 tons 5/13/99 9 tons 5/17/99 55 tons 5/17/99 17 tons 5/20/99 32 tons 5/27/99 55 tons 6/1/99 17 tons 6/3/99 17 tons 6/8/99 9 tons 6/30/99 17 tons 7/8/99 17 tons 8/2/99 9 tons 10/26/99 9 tons 10/29/99 17 tons 12/3/99 9 tons 12/6/99 17 tons 1/6/00 20 tons 2/2/00 17 tons 2/4/00 17 tons
TOTAL 2,563.5 tons
The court has excluded purchases of heavyweight board and board purchased to provide inventory to cover the period of Simkins' plant improvements in August and September 1999. Based on the testimony of several witnesses, the court has estimated that two million sheets, the measure reported on Exhibit 12, corresponds to one ton.
The defendant asserts that the specification that the purchases from Simkins must be "at competitive prices" allowed Standard to buy job lots on the spot market. Such a construction is not supported by the words or context of the contract.
The court finds that the defendant breached the contract by buying from other vendors 2,563.5 tons of paper that Simkins was able to supply at competitive prices. No evidence was presented to suggest that any of the purchases listed above were made because Simkins' paper would not fulfill the needs of Standard's customers. Simkins is therefore entitled to damages in the amount of profits lost on this tonnage.
The UCC provides at § 42a-1-106 that remedies provided by that Code "shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed." CT Page 7237 If Standard had fully performed its obligation to purchase an additional 2,563.5 tons of board from Simkins, Simkins would have realized revenue in the amount of the competitive price per ton less the expenses of producing that board. The UCC provides at § 42a-2-708 (1) that a seller's damages for nonacceptance or repudiation of goods is, in appropriate circumstances, measured by the difference between the market price and the contract price, together with certain incidental damages and less expenses saved.
Section 42a-2-708 (2) provides that where such damages are "inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in section 42a-2-710, due allowance for cost reasonably incurred and due credit for payments or proceeds of resale." The calculation of damages described in § 42a-2-708
(1) does not put Simkins in as good a position as performance would have done because Simkins had the capacity to produce the 2, 563.5 tons in addition to the tonnage that it sold to other customers. Standard's breach caused Simkins to sell less tonnage overall, a situation not redressed by a remedy that measures loss by a comparison of the contract price to one buyer and the price obtained from another buyer for the same goods.
Standard correctly observes that the plaintiff has the burden of proving its lost profits with reasonable certainty. Beverly Hills Conceptsv. Schatz Schatz, 247 Conn. 48, 64, 66 (1998). Unlike the situation in Beverly Hills Concepts, the plaintiff in this case is not attempting to recover damages for a proposed new business with no track record, rather, Simkins has been in the business of producing and selling recycled paperboard for many years, and financial data relating to Simkins' Lowe mill are in evidence. (Ex. 18.) Connecticut's Supreme Court has recognized that losses resulting from breach of contract are not to be denied merely because they are difficult to determine, and that the philosophy of the UCC and of contract law is "to require that degree of proof of damages which the facts permit, but no more." Bead Chain Mfg.Co. v. Saxton Products, Inc., 183 Conn. 266, 278-79 (1981), citing Conn. Gen. Stat. § 42a-1-106 (1).
Under § 42a-2-708 (2), Simkins is entitled to recover from Standard its anticipated net profit, plus those fixed costs which could be regarded as overhead. "`[P]rofit (including reasonable overhead)' is the equivalent of net profit plus overhead, or of gross profit, including overhead." Bead Chain Mfg. Co. v. Saxton Products, Inc, supra,183 Conn. 277-78. CT Page 7238
Simkins presented the testimony of Conrad Kappel, a certified public accountant employed by Blum Shapiro Litigation Consulting Group, LLC, whose practice is now limited to preparing proof of damages for claims and litigation. Mr. Kappel, who prepared a report (Ex. 15) related to Simkins' claim for lost profits for the unexpired term of the contract, a claim on which Simkins has not prevailed, did not prepare a calculation of damages caused by Standard's purchases from other suppliers before terminating the contract. His calculations, however, when reviewed together with Simkins' statements of profit and loss for the applicable years (Ex. 18), provide this court with a basis for calculating the lost profits and overhead for this tonnage.
Simkins' gross profits (net profit plus overhead) at the Lowe mill for the fiscal year ending September 30, 1998, were 56.3% of gross sales. The figure for the fiscal year ending September 30, 1999, is 54.9%, and the figure for the fiscal year ending September 30, 2000, is 48.1%. Standard argues that one of its witnesses, Philip Lieder, testified that net profits in the recycled paperboard industry for the period at issue was between eight and fourteen percent; however, he was not asked to state gross profits or net profit plus overhead. His testimony was thus directed to only a portion of the calculation which the Connecticut Supreme Court has ruled is the proper calculation of damages for breach of a contract to purchase goods. The witnesses agreed that paper mills have high fixed expenses, apart from the variable costs for materials needed to produce extra volume of product. Connecticut case law treats the loss of the ability to meet those expenses from a contracted sale as part of benefit-of-the-bargain damages.
Applying these gross profit percentages to the 2, 563.5 tons of board that Standard was obligated to purchase from Simkins and purchased elsewhere in breach of its contract, and applying the prices, less the agreed $50.00 discounts, in effect at various periods, the court finds damages as follows:
2/1/98 — 8/1/98 601 tons x $485/ton x 56.3% = $164,106.06 8/1/98 — 9/31/98 245 tons x $465/ton x 56.3% = $ 64,139.78 10/1/98 — 12/7/98 381.5 tons x $465/ton x 54.9% = $ 97,391.23 12/7/98 — 9/1/99 1230 tons x $445/ton x 54.9% = $300,495.15 10/1/99 — 2/4/00 106 tons x $475/ton x 48.1% = $ 24,218.35
TOTAL 2,563.5 tons TOTAL $650,350.57
The court finds that the defendant's breach of its obligation to buy all the paperboard it could from Simkins before it terminated the contract in February 14, 2000, caused the plaintiff to suffer damages in the amount of $650,350.57. CT Page 7239
Claim for recovery of rebates
Simkins claims that it is entitled to a return of the $50 per ton rebates it provided to Standard on the ground that Standard is not entitled to those rebates because it breached its obligation to continue to purchase recycled paperboard from Simkins for the full term of the contract. This court has found that the termination was justified and did not constitute a breach of Standard's obligations to Simkins. The contract does not contain a provision requiring a refund of rebates in the event of termination. This court may not supply terms not stated in the contract entered into by the parties. United Illuminating Co. v.Wisvest-Connecticut, LLC, 259 Conn. 665, 673-74 (2002); Newman andPartners v. CFC Construction Ltd. Partnership, 236 Conn. 750, 760 1996);Heyman v. CBS, Inc., 178 Conn. 215, 227 (1979); Texaco, Inc. v. Rogow,150 Conn. 401, 408 (1963); Eastern Bus Lines, Inc. v. Board ofEducation, 7 Conn. App. 581, 587 (1986).
Counterclaim
Standard has counterclaimed seeking damages for losses it claims it suffered because Simkins provided it with board that did not meet its requirements and that caused it to suffer loss of productivity, increased production costs, and loss of the value of the board supplied. Simkins has pleaded accord and satisfaction as a special defense to this claim. As has been explained above, on each occasion on which Standard experienced a work stoppage or had to cull out and scrap printed product because of problems with the board supplied by Simkins, it presented Simkins with complaints on which it calculated its losses. Standard then deducted the amount of each of its claims from the payments it made to Simkins.
An accord is a contract between creditor and debtor for the settlement of a claim by some performance other than that which is due. TollandEnterprises v. Scan-Code, Inc., 239 Conn. 326, 333 (1996); see BB BailBonds Agency of Conn., Inc. v. Bailey, 256 Conn. 209, 212-213 (2001). Satisfaction takes place when the accord is executed. Newman and Partnersv. CFC Construction Ltd. Partnership, supra, 236 Conn. 764; W.H. McCune,Inc. v. Revzon, 151 Conn. 107 (1963); Bull v. Bull, 43 Conn. 455, 462
(1876).
The evidence presented at trial does not establish that the parties ever agreed to amounts of compensation for any claims for damages that Standard had against Simkins or that the parties ever discussed the amounts at issue. Simkins' witnesses uniformly testified that Standard simply took deductions in the amounts it unilaterally determined, and the court finds that these deductions were not the product of any agreement CT Page 7240 between the parties. The doctrine of accord and satisfaction does not therefore bar Standard's claim.
At trial, Standard asserted that its losses caused by Simkins' board exceeded the amounts it had claimed when it took deductions. When it took these deductions, it calculated the cost of each hour of downtime for its printing press at the rate of $450 per hour. It calculated its loss from the need to inspect printed sheets to pull out those with delamination, dirt, mottling, hickies, and other problems on the basis of labor costs for the employees who did that work. Standard returned defective board to Simkins and took a credit in the amount of the price it had paid for the board, and Simkins paid the freight costs. At trial, Standard presented evidence to the effect that its damages for each hour of downtime were, instead, between $1200 and $1300. Standard did not present credible evidence to support this calculation, and the court notes that Standard was vigilant in protecting its own advantage in its dealings with Simkins and was unlikely to have understated its actual losses at the time it took deductions.
The court finds that Standard's losses from defective board are the amounts it represented to Simkins when it submitted its complaints, and that it has already recovered those amounts by taking deductions from the amounts it owed Simkins for board delivered to it.
Accordingly, while Standard has proved that it suffered damages from the delivery of defective goods, it has already recovered its damages.
Conclusion
The court finds that the plaintiff has failed to prove the existence of any contract with Standard Folding Cartons, Inc. or Southern Standard, Inc. Judgment shall enter in favor of these defendants.
Judgment shall enter in favor of the plaintiff against the defendant The Standard Group, Inc. in the amount of $652,179.40 on the plaintiffs claim of breach of the provision to purchase all possible board from the plaintiff, and in the amount of $60,846.93, plus $11,569.30 in prejudgment interest on the plaintiffs claim of nonpayment of amounts due for board delivered and not rejected before the defendant terminated the contract.
Judgment shall enter in favor of The Standard Group, Inc. as to the plaintiffs other claims of breach of contract.
Judgment shall enter in favor of the plaintiff on the defendants' counterclaim. CT Page 7241
The plaintiff shall recover its statutory court costs upon filing a bill of costs with the court officer pursuant to Conn. Gen. Stats. §52-257 et seq. and Practice Book § 18-1 et seq.
 ___________________ Beverly J. Hodgson Date Judge of the Superior Court